761 So.2d 907 (2000)
Danny T. JONES, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01102-COA.
Court of Appeals of Mississippi.
April 11, 2000.
Rehearing Denied June 6, 2000.
*908 Jeanine M. Carafello, Jackson, Attorney for Appellant.
Office of the Attorney General by John R. Henry Jr., Attorney for Appellee.
BEFORE McMILLIN, C.J., BRIDGES, AND PAYNE, JJ.
McMILLIN, C.J., for the Court:
¶ 1. Danny Jones, while driving a vehicle in Smith County, struck and killed Ondean McAlpin. After evidence was developed that Jones was under the influence of a narcotic drug at the time of the incident, he was indicted and convicted of DUI manslaughter in McAlpin's death. He has appealed that conviction to this Court, asserting two issues that he claims warrant a reversal of his conviction.
¶ 2. The first issue raised by Jones is that the trial court erred in refusing to suppress the results of chemical analysis of *909 a blood sample extracted shortly after the accident. In actuality, this matter requires consideration of three separate legal issues. Jones claims that his due process rights were violated when a portion of the sample not needed for the testing was destroyed, thereby depriving him of the opportunity to have an independent chemical analysis of his blood. Secondly, he urges that the sample was drawn in a manner contrary to that dictated by the statute regarding such matters. Finally, he suggests that the State could not demonstrate the necessary chain of custody to show with sufficient certainty that the lab results introduced into evidence were derived from blood obtained from him.
¶ 3. As his second issue, Jones argues that an investigating officer was permitted to offer testimony in the nature of accident reconstruction without being qualified as an expert in that field.
¶ 4. We find the issues raised by Jones do not constitute reversible error. Therefore, we affirm his conviction.

I.

Facts
¶ 5. Jones struck McAlpin while she was using a riding mower to cut the grass in her front yard. The State contended that Jones struck her while she was in her yard, while Jones asserted that McAlpin had unexpectedly driven into the highway right-of-way, thereby making the accident unavoidable. Jones was also injured in the accident and was taken to Magee General Hospital for treatment. Because Jones had been exhibiting signs of chemical impairment in the aftermath of the accident, officers became suspicious that he may have been under the influence of intoxicants or some narcotic substance. For that reason an intern at the hospital drew a blood sample from Jones for testing, though the intern was unable to recall at trial who had directed her to draw and retain the sample.
¶ 6. The blood was tested at the State Crime Laboratory and was discovered to contain the drug Butalbital, which is a prescription medication that acts as a sedative and is a barbiturate. The crime lab, although able to detect the presence of the drug, lacked the facilities to measure the level of the dosage. As a result, the remainder of the sample was sent to a private testing facility for further analysis. An official from the private laboratory testified at trial that those additional tests revealed a dosage level of fourteen micrograms of Butalbital per milliliter of blood, which was a near-lethal amount of the drug. The State's theory was that, even though Jones had a prescription for the drug, he had purposely overmedicated himself to the extent that his ability to operate a motor vehicle was substantially impaired, thereby making him answerable criminally for McAlpin's death.

II.

Destruction of the Remainder of Blood Sample
¶ 7. The private laboratory that performed the dosage level testing on Jones's blood had a standing policy that, in the absence of a directive to the contrary, the unused residue of a testing sample would be destroyed after six weeks. Under that policy, the remainder of Jones's blood sample was destroyed before he was indicted. He now claims that the State's failure to take the steps necessary to preserve the sample residue in order to afford him the opportunity to have his own independent tests run denied him his due process right to a fundamentally fair trial.
¶ 8. The intentional destruction of evidence by the State has been held to raise constitutional issues of due process if that evidence could reasonably be seen as playing a significant role in a suspect's defense. California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); Tolbert v. State, 511 So.2d 1368, 1372 (Miss.1987). In this case, there is no doubt that the level of narcotic in Jones's *910 blood was a significant issue at trial; however, the only purpose additional testing could have served would have been to uncover possible defects in the testing procedures used by the private laboratory. In California v. Trombetta, the United States Supreme Court found it constitutionally unobjectionable that California authorities had failed to preserve a breath sample from the defendant after testing him on an intoxilyzer, though it was technically feasible to preserve such a sample. Trombetta, 467 U.S. at 485-88, 104 S.Ct. 2528. In that case, the Supreme Court said that, in order to raise constitutional concerns, the unavailable evidence must have had some demonstrable exculpatory value that was evident prior to destruction and also had to be evidence of such a nature that it was not obtainable by some other reasonable means. Id. at 489, 104 S.Ct. 2528. The court concluded that it was merely speculative that additional tests would impeach the test results already obtained, so that the breath samples could not pass the "exculpatory value" test. Id. As to the second prong of the test, the court noted that there were other means beside retesting the sample to attack the probative value of a laboratory test results, including an attack on the general proficiency and competence of the laboratory. Id. at 490, 104 S.Ct. 2528.
¶ 9. The Mississippi Supreme Court has held that merely holding out the possibility that further testing would call the earlier test results into doubt is not enough to meet the standard announced in Trombetta. Taylor v. State, 672 So.2d 1246, 1271 (Miss.1996).
¶ 10. In the absence of any indication that the laboratory results obtained by the State from the private testing laboratory were, for some reason, untrustworthy, we do not find that the routine destruction of the remaining blood sample invoked constitutional due process concerns that would require the test results to be excluded.

III.

The Procedure for Drawing the Sample
¶ 11. Jones claims that the results of the testing were inadmissible because the blood sample was not drawn in accordance with the statutory procedure set out in Section 63-11-8 of the Mississippi Code as it was in effect at the time of the accident. The statute at that time required that a blood sample be drawn only if the treating physician permitted it and listed several alternate persons authorized to draw the sample, including clinical laboratory technician. Miss.Code Ann. § 63-11-8(1) (1995), revised 1996.
¶ 12. Jones's blood in this case was drawn by Lashun Farrish, an uncertified technician trainee, who was unable at trial to confirm that Jones's treating physician had approved the drawing of blood in advance of her work. Jones claims that this constituted a fundamental failure to meet the statutory requirements for obtaining a blood sample, so that any evidence derived from the sample should be excluded.
¶ 13. It is now well-established in this State that the admissibility of evidence in a judicial proceeding is a matter determined according to the applicable rules of evidence, subject to any constitutional concerns that might come into play, and not according to dictates of legislative enactments. In Whitehurst v. State, the Mississippi Supreme Court dealt with a then-existing provision of Section 63-11-7 that required blood testing on certain unconscious accident victims but went on to say that the results could not be admitted in a judicial proceeding without the person's consent. Whitehurst v. State, 540 So.2d 1319, 1322 (Miss.1989). Whitehurst sought to use this provision to exclude test results of a blood sample drawn while he was temporarily incapacitated after an accident. The court found that the means of gathering the evidence had not violated any constitutional protection afforded Whitehurst and also found that the test results, but for the statutory prohibition, *911 were admissible under the rules of evidence. Id. at 1323. Based on those findings, the court declared the attempt by the Legislature to exclude competent evidence to be an unwarranted interference in the judicial branch's solemn obligation to pursue the truth.
¶ 14. In the case now before us, there is no claim by Jones that it is constitutionally impermissible to gather a blood sample in the circumstances of this case. Prior case law has, in all events, already decided that question against Jones. See, e.g., Whitley v. State, 511 So.2d 929, 931 (Miss.1987). Neither are we cited to any authority that any violation of the specific dictates of the statute automatically renders the resulting evidence so untrustworthy that it ought to be excluded as lacking any probative value.
¶ 15. In Fulton v. City of Starkville, the supreme court made it clear that substantial compliance with a similar statute's directives was sufficient to meet concerns of admissibility, since the real inquiry was whether the procedure followed was one that (a) could pass muster as not running afoul of any constitutional protection afforded a potential criminal defendant, and (b) afforded sufficient integrity in the gathering process as to reasonably assure that the information was trustworthy and had real probative value. Fulton v. City of Starkville, 645 So.2d 910, 914 (Miss.1994).
¶ 16. As for Jones's argument that the State failed to prove that a treating physician had approved drawing the sample, we do not find that to be a requirement affecting the integrity of the evidence. Rather, it would seem that this was a requirement intended to ensure that the procedure did not unduly jeopardize the injured person's condition. Thus, Jones might have some remedy if it could be shown that there was an adverse consequence to his health from drawing the blood sample without physician approval, but we are satisfied that his remedy would not be to have the test results from such an imprudently-drawn sample excluded from evidence in a criminal prosecution.
¶ 17. Jones is further able to point us to no evidence that would indicate that, due to lack of skill or professional ability, Lashun Farrish was so inept in drawing a blood sample that the sample was somehow compromised to the extent that subsequent testing was not probative of the chemical contents of the blood sample.
¶ 18. The procedure outlined in the statute appears to be one reasonably calculated to result in a blood sample that may be relied upon as being properly identified to the suspect and free of unintended contaminants that might render subsequent test results untrustworthy. To the extent that this is the purpose of the statute, we find its provisions to be directive in nature and not mandatory. In that light, we find nothing in those variations from the specific directives of the statute that occurred in this case that convinces us that the sample was so compromised as to render suspect the results of any tests conducted on it.

IV.

Chain of Custody
¶ 19. Finally, in regard to the blood sample test results, Jones claims that there was enough evidence introduced to cast doubt that the blood tested was the same blood drawn from him on the night of the accident. His primary argument centers around evidence that, at one point, the samples were recorded as being in vials with purple colored tops, but when they were opened at the Mississippi Crime Lab, the vials were noted as having grey tops.
¶ 20. Countering this unexplained discrepancy was evidence that the samples had been, at all times, carefully labeled as to their contents and receipted for at each exchange of custody. The purpose of requiring a chain of custody of evidence gathered by law enforcement officials is to afford reasonable assurance that the evidence is genuine and that there has been no substitution through inadvertence or *912 malfeasance. Wells v. State, 604 So.2d 271, 277 (Miss.1992). The trial court was satisfied that the discrepancy concerning the color of the vial tops did not raise a serious issue as to the authenticity of the blood sample as being the one drawn from the defendant. The trial court is vested with substantial discretion in ruling on evidentiary matters such as this. Id. We find nothing to suggest that the court abused its discretion when it determined that enough evidence existed to connect the results of the testing to the blood sample drawn from the defendant's body on the night of the accident.

V.

Improperly Admitted Expert Testimony
¶ 21. Jones also urges that the trial court erred when it permitted a Highway Patrol officer, David Blakeney, to testify regarding the point of impact of the accident. Jones argues that the officer's testimony constituted expert opinion evidence that could only be admitted under Mississippi Rule of Evidence 702, which would require that the officer be tendered and accepted as an expert in accident reconstruction. No such effort was made in this case.
¶ 22. The record reveals that Blakeney testified in some detail about his observations at the scene of the accident that were undertaken in the course of his assisting the sheriffs department in the accident investigation. Blakeney conducted an in-depth examination of the accident scene, inspected Jones' vehicle, observed the location of various strewn vehicle parts, noted the location of skid marks, and took photographs to permanently record those things that he observed. Most of Blakeney's testimony on direct was simply his interpretation of photographs he had taken at the scene, and the evidence was received largely without objection. Blakeney did not offer an opinion as to the point of impact on direct examination, though more than once he referred to a depression appearing in the photograph that he quite evidently had determined to be the impact point in his own mind. On cross-examination Jones's attorney asked a series of questions that appeared to have as their purpose raising some measure of doubt as to whether the point of impact might have been, instead, at a point nearer or in the highway right of way where there was some sort of mark in the road.
¶ 23. On re-direct, Blakeney was permitted, over the defense's timely objection, to offer his opinion that the collision occurred at the point he had intimated earlier in his direct testimony. It is this testimony on redirect that Jones now claims constituted reversible error.
¶ 24. We are satisfied that it was not error to permit Blakeney to offer such an opinion for two equally satisfactory reasons. First of all, it is clear that Blakeney's opinion was lay opinion evidence admissible under Mississippi Rule of Evidence 701, since it was based on his observations of the resting place of Jones's vehicle after the accident and his ability to trace the path of the vehicle by following skid marks backwards from the resting place to a point where the physical evidence indicated that fairly violent event had occurred. One need not be an expert accident reconstructionist to offer an opinion that tire marks appearing at the scene of accident indicate with some measure of precision the path the vehicle followed at the time of the accident. A lay person, through his ordinary experience of life, is capable of observing the typical physical phenomena that exist in the aftermath a vehicular collision, such as skid marks and debris location, and making an intelligent assessment of certain basic facts of the accident. In this instance, we do not find that Blakeney's testimony moved so far from his basic interpretation of those actual physical things he observed at the scene as to require that he possess specialized training, knowledge or experience in order to offer his opinion of the point of impact.
*913 ¶ 25. Secondly, Jones's own defense counsel opened the door to Blakeney's opinion of the point of impact based on Blakeney's evaluation of the observable post-accident phenomena when counsel attempted to elicit Blakeney's opinion that the physical evidence portrayed in the photographs more likely indicated that the point of impact was closer to, or in, the road right of way. See Davis v. State, 530 So.2d 694, 699 (Miss.1988).
¶ 26. We decline to find reversible error in this aspect of Officer Blakeney's testimony.
¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF SMITH COUNTY OF CONVICTION OF DUI MANSLAUGHTER AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT WRITTEN OPINION.