7 P.3d 478

2000-NMSC-022

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Shane Glen HARRISON, Defendant–
Appellant.**

No. 25,157.

Supreme Court of New Mexico.

July 18, 2000.

Rehearing Denied Aug. 10, 2000.

D. Eric Hannum, Albuquerque, for Appellant.

Patricia A. Madrid, Attorney General, Elizabeth Blaisdell, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

SERNA, J.

{1} Defendant Shane Glen Harrison appeals his convictions for nineteen felony counts, including first degree felony murder for the deaths of George and Pauline McDougall. *See* Rule 12–102(A)(1) NMRA 2000 (appeals from sentence of life imprisonment taken to the Supreme Court). Defendant asserts six errors on appeal: (1) whether the trial court erred by admitting testimony of John Lausell; (2) whether the trial court abused its discretion by admitting expert testimony of a polygrapher; (3) whether the trial court erred by denying Defendant's motion for a mistrial when the State elicited testimony from the polygrapher regarding criminal defendants' polygraph examinations; (4) whether the trial court abused its discretion by refusing to allow Defendant to re-open his case to present rebuttal polygrapher testimony; (5) whether Defendant's trial counsel violated his right to effective assistance of counsel by failing to present rebuttal testimony in a timely manner; and (6) whether the trial court violated Defendant's right to due process by refusing to declare a mistrial because of juror complaints. We affirm Defendant's convictions.

## I. Facts and Background

{2} Defendant was charged with five counts of murder, as well as multiple counts of kidnapping, armed robbery, conspiracy, and tampering with evidence. Esther Beckley, Defendant's accomplice, testified against Defendant after entering into a plea agreement with the State. In exchange for her testimony against Defendant and her guilty plea to ten charges, which included two counts of first degree felony murder for the deaths of the McDougalls, the State dismissed three counts of first degree murder and did not pursue the death penalty against her. She received two consecutive life sentences plus thirty-five and one-half years.

{3} On February 23, 1996, a man and a woman robbed a Mac's Steak in the Rough restaurant in Albuquerque. An employee identified the woman as Beckley. Beckley testified that she and Defendant planned and carried out the robbery armed with a BB gun that looked like a .45 caliber gun. The employee did not see the male robber's face, but did hear a male voice. Two witnesses, Liza Turner and John Lausell, testified that Defendant had told each of them that he had robbed the restaurant. Lausell lived with and dated Beckley.

{4} Beckley testified that, in her presence, Defendant bought a Tec–9 nine millimeter semiautomatic pistol and ammunition for that weapon, and also shotgun ammunition. These weapons were used in the five murders. Beckley testified that Defendant kept the Tec–9, the shotgun, and two BB guns, one used in the restaurant robbery and one purchased following the robbery, in a duffel bag. The police recovered the duffel bag containing the murder weapons and BB guns during a search of Defendant's apartment near the time of Defendant's arrest.

{5} Sometime after 2:00 a.m. on March 3, 1996, a Hollywood Video store in Albuquerque was robbed. Employees of the video store arrived at 9:30 a.m. on Sunday, March 3, and discovered the bodies of three employees, Zachary Blacklock, Jowanda Castillo,

and Mylinh Daothi, who had each been shot in the back of the head three times. George and Pauline McDougall, Zachary's grandparents, were scheduled to pick him up at 2:00 a.m., after the store closed. On March 4, the McDougalls' bodies were found in the Sandia Mountains east of Albuquerque near their car; each had died of multiple gunshot wounds.

{6} Beckley testified that she and Defendant planned to rob the video store the night before the actual robbery took place. Beckley testified that she and Defendant drove up to the store in Defendant's black car and saw an employee locking the door. An employee testified that a black car with two people drove up; she identified Defendant and stated that he came up to the doors, attempted to pull them open, and asked her to let him in. She refused, telling him that the store was closed. The employee testified that he became upset and continued to ask to be let into the store, but she did not let him into the store.

{7} Beckley testified that she and Defendant returned to the video store the following night at an earlier time. The last customer that was in the store the night of the robbery testified that he saw a white man, about twenty-five to thirty years old, and a white woman in the store together. The customer positively identified Esther Beckley in a lineup but did not identify Defendant in a lineup. The customer was shown a picture of Lausell, a forty-seven-year-old black man, and testified that Lausell was definitely not the man he saw in the store the night of the robbery.

{8} Beckley testified that after the last customer left the video store, she approached the manager, Mylinh Daothi, displayed her BB gun, and forced her to go into the office at the back of the store in order to get the video surveillance tape which would show her and Defendant in the store. Beckley stated that she retrieved the surveillance tape. Zachary Blacklock then entered the office, and Beckley informed him that a robbery was taking place and instructed him not to move. Beckley testified that Defendant came to the back of the store with Jowanda Castillo. Beckley stated that Defendant

pulled out his BB gun and took Mylinh to the front of the store to get into the safe while Beckley stayed in the back with the other two employees. Zachary informed Beckley that his grandparents were going to pick him up. Beckley saw a car drive up and testified that Defendant told her to try to get into the car with the grandparents and prevent them from leaving.

{9} Beckley stated that she told the McDougalls that Zachary and the manager were still busy, and she asked if she could join them in their car because she claimed her car heater did not work. She testified that the McDougalls were very friendly towards her, let her into the car, and spoke with her while they waited. Pauline McDougall was in the driver's seat and George McDougall was in the front passenger seat. Beckley stated that she could see into the store from the McDougall's car and that she saw Defendant and Mylinh walking inside the store. She testified that she heard gunshots but that the McDougalls did not appear to react to the sounds.

{10} Beckley testified that Defendant ran out of the store carrying a plastic trash bag and the Tec–9; he threw the bag into his car, ran to Pauline McDougall's side of the grandparents' car, and told her to open the window. She complied, and he told her to open the door. When it appeared that she would not do so, Defendant instructed Beckley to force her to open the door. Defendant instructed Beckley to exit the vehicle; he got into the back seat, and he told Beckley to follow them driving his car.

{11} Beckley testified that they drove into the mountains and that Defendant and the McDougalls exited their car. She stated that Defendant retrieved his shotgun from his car and walked with the McDougalls into the trees. Beckley recounted that George McDougall turned to Defendant and that Defendant then shot him and Pauline McDougall several times with the shotgun. She testified that Defendant returned to the car, threw the shotgun into the car, and told her that the McDougalls were still making noise. Defendant then pulled the Tec–9 out of his pants, returned to the McDougalls, and shot them multiple times with the Tec–9. Al-

though Beckley testified at trial that Defendant shot the McDougalls, she testified that she had previously told Lausell that she fired the shotgun herself.

{12} Beckley testified that as Defendant drove his car away from the McDougalls, his car bottomed out in a rut. A detective testified that a piece of Defendant's car was found at the McDougall murder scene.

{13} Defendant's neighbor, who was out of town for part of the weekend of the murders, testified that he returned home on Saturday night and noticed that his black leather jacket was missing from his closet, but when he returned home on Sunday, the jacket had been returned. Beckley testified that Defendant wore the neighbor's jacket during the robberies. Defendant had a key to the neighbor's apartment and admitted that he borrowed the jacket that weekend. The neighbor testified that Defendant had previously told him that he knew of a place which could be robbed and that people could get hurt in the robbery. The neighbor was with Defendant when Defendant bought the shotgun used in the murders, and the neighbor testified that Defendant told him that he was buying the shotgun to protect himself. Defendant offered contrary testimony, stating that he bought the shotgun for John Lausell.

{14} A prison acquaintance of Defendant's testified that Defendant told him, prior to the murders, that the next time he committed an armed robbery he would not leave witnesses. A different acquaintance, a man who had been in the county jail with Defendant, testified that Defendant described a robbery which Defendant had committed at the Los Arcos Restaurant, and Defendant told him that if the Defendant had shot the witness who had eventually called the police he never would have been caught.

{15} Defendant gave a statement to the police upon his arrest, on March 12, 1996, which was admitted as evidence in Defendant's trial. Defendant also testified at trial, admitting that he bought the shotgun and the Tec-9 which were used in the five murders and found in his apartment after his arrest. Defendant, in his statement to the police and in his testimony at trial, claimed

that Beckley told him that Beckley and others committed the crimes.

{16} Defendant testified at trial that he bought the guns for Lausell and that Beckley took the guns. He testified that he lent his car and his neighbor's jacket to Beckley on the night of the crimes and that he stayed home by himself. He claimed that Beckley came back to his apartment at approximately 5:00 a.m. on Sunday, March 3, and told him he should get rid of the jacket because it had blood on it. Defendant testified that Beckley told him to change the tires on his car, because it was used in the murders; he stated that he did buy new tires. Defendant testified that he and another man drove to the mountains, and Defendant dug up the guns, which were in a black duffel bag, and took them back to his apartment.

{17} A jury found Defendant guilty of nineteen counts but was unable to reach unanimous verdicts on three counts of murder for the deaths of Jowanda Castillo, Zachary Blacklock, and Mylinh Daothi. Defendant was sentenced to two consecutive life terms plus an additional 198 years, totaling a term of 258 years imprisonment.

## II. Discussion

### A. Lausell's Testimony

{18} The trial court has discretion regarding the admission or exclusion of evidence, and a trial court's evidentiary ruling will not be disturbed on appeal absent an abuse of that discretion. *See State v. Stampley*, 1999–NMSC–027, ¶ 37, 127 N.M. 426, 982 P.2d 477; *State v. Brown*, 1998–NMSC–037, ¶ 32, 126 N.M. 338, 969 P.2d 313. In order to find an abuse of discretion, this Court must conclude that the trial court's decision to admit testimony was obviously erroneous, arbitrary, or unwarranted. *Brown*, 1998–NMSC–037, ¶ 39, 126 N.M. 338, 969 P.2d 313.

{19} Defendant argues that the trial court abused its discretion when it admitted the testimony of Lausell regarding statements made by Beckley to Lausell which implicated Defendant in the murders. Defendant's trial counsel objected on hearsay grounds to Lausell's testimony regarding Beckley's statements to him. The court found that Lau-

sell's testimony was admissible based on Rule 11–801 NMRA 2000.

A statement is not hearsay if:

(1) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . .

(b) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. . . .

Rule 11–801(D).

{20} Defendant argues that Beckley admitted that at least some of her statements to Lausell were lies in an attempt to impress him and keep him from leaving her, and Defendant asserts that this motive to lie to Lausell arose before she made her statements to him. Defendant argues that the trial court should not have admitted Lausell's testimony as a prior consistent statement offered to rebut an express or implied charge of recent fabrication because the prior statement, to be admissible, must have been made before the alleged motive arose, relying on *State v. Casaus*, 1996–NMCA–031, ¶¶ 17–20, 121 N.M. 481, 913 P.2d 669, and *Tome v. United States*, 513 U.S. 150, 156, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). In his brief in chief, Defendant asserts that Beckley had two motives to continue reiterating the same story: First, she was still devoted to Lausell, in spite of the fact that he gave information to the police; and second, her plea agreement with the State prevented variation from her original statements because of the threat of the death penalty. Defendant contends that Lausell's testimony improperly bolstered Beckley's credibility.

## 1. Preservation of Defendant's Appellate Argument

■ {21} Defendant failed to properly preserve the claim he now argues on appeal. The State, without further analysis, notes Defendant raises this argument for the first time on appeal. Defendant's only response is that he believes his objections speak for themselves. Defendant argues that his objection to the testimony as hearsay was enough to be sufficiently clear to the trial court. We disagree.

{22} Defense counsel objected to Lausell's testimony merely as "hearsay." The trial court stated that it did not understand Defendant's objection and asked defense counsel if he was "contesting what Esther Beckley said was the truth." Defense counsel replied that he was contesting Beckley's truthfulness, but he argued that it did not give the State "the right to come in and utilize hearsay," and that he was objecting on that basis. The State responded that the testimony was admissible as "either prior inconsistent or prior consistent" statements, and the trial court ruled that the testimony was "clearly admissible under [Rule] 11–801." Thus, the State properly countered Defendant's hearsay objection with a reference to Rule 11–801, which the court clearly understood; the State was arguing, and the trial court accepted, that the testimony was not hearsay because it was "consistent with the declarant's testimony and [was] offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *See* Rule 11–801(D)(1)(b).[1]

{23} At this point, in order to preserve the argument, Defendant had to alert the trial court that he believed that the declarant had an improper motive that predated the time she made the statement to Lausell. Defense counsel did not argue to the trial court at that time that Beckley had a motive to lie which predated her statements to Lausell. During Lausell's testimony regarding the statements Beckley made to him concerning the robberies and murders, defense counsel did not object or request the trial court to exclude that portion of Lausell's testimony based on this theory of Beckley's motive to lie to Lausell.

{24} Thus, Defendant did not alert the trial court to the specific nature of his general hearsay objection, even after the State and the trial court clearly believed the testimony was admissible under Rule 11–801. In order

1. Beckley's statements to Lausell, assuming that they were inconsistent, were not made under oath. Thus, Rule 11–801(D)(1)(a) would not apply.

to properly preserve this claim on appeal, Defendant had to argue that he believed that Beckley had a motive to lie before she made the statements to Lausell.

{25} "The question of when a motive to lie arises is a question the trial court answers, reviewable by an appellate court under the abuse of discretion standard." *Brown*, 1998–NMSC–037, ¶ 32, 126 N.M. 338, 969 P.2d 313. In *Brown*, this Court recounted that "Defendants objected to the introduction of [a prior consistent statement] arguing that [the declarant] had a motive to fabricate," which arose before he told the witness his story. *Id.* ¶ 34. Because the defendants made the proper argument at trial, the trial court in *Brown* was then able to consider and rule on the argument, rejecting the defendants' claims that the motive to lie predated the time the declarant made the statement to the witness. *Id.*

{26} The Court of Appeals, in *Casaus*, 1996–NMCA–031, ¶ 19, 121 N.M. 481, 913 P.2d 669 recognized that Rule 11–801(D)(1)(b) requires trial courts to determine "not only whether 'improper influence or motive' exists but also when the motive originated." In *Casaus*, the Court of Appeals concluded that the testimony was inadmissible because the prior consistent statement "did not pre-date the improper influence or motive," and determined that the defendant raised the motive to lie in his opening statements, showing that the motive arose two weeks before the statements were made. *Id.* ¶ 20. In contrast, defense counsel did not mention in opening statements that Beckley's motive to lie was to convince Lausell not to leave her; rather, defense counsel implied that she was lying to police in order to protect Lausell, and that after Lausell turned her into the police, she was coerced by the threat of the death penalty to continue telling the same story. Because Defendant did not alert the trial court to his specific theory that Beckley was lying when she made the statements to Lausell, the trial court never had the opportunity to determine when the motive to lie would have arisen.

{27} While it may be proper for a defendant to have multiple theories of the crime, Defendant, in order to preserve an argument for appeal, must alert the trial court as to which theory is at issue in order to allow the trial court to rule on the objection. On appeal, Defendant argues that Beckley's motive to lie to Lausell arose from an initial motive to keep him from leaving her, and Lausell's testimony was therefore inadmissible under the premotive requirement discussed in *Tome* and *Casaus*. Defendant did not present this argument to the trial court when defense counsel objected to Lausell's testimony, and because of the multiple motives alleged by defense counsel, the trial court could not have assumed which motive to lie defense counsel was referring to when he objected to Lausell's testimony merely as hearsay. Defense counsel maintained throughout the trial that Lausell was actually the murderer in this case; it is paradoxical for Beckley to lie to Lausell in order to keep him by telling him she committed these crimes with Defendant if, in fact, she committed the crimes with Lausell. She would not reasonably tell her accomplice that she committed these very crimes with another person. Thus, if Defendant wanted to assert a new motive and theory of Beckley's statements to Lausell, that Lausell was not involved with the crimes and therefore knew nothing about them and that Beckley was lying to Lausell in order to impress him, he had to inform the trial court of this theory in order to fairly invoke a ruling by the court. As discussed further below, the trial court had instead been repeatedly presented with Defendant's theory that Lausell himself committed the crimes.

{28} "A trial is first and foremost to *resolve* a complaint in controversy, and the rule [of preservation] recognizes that a trial court can be expected to decide only the case presented under issues fairly invoked." *State v. Gomez*, 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1; *accord* Rule 12–216(A) NMRA 2000 (establishing that in order for an appealing party to preserve a question for review "it must appear that a ruling or decision by the district court was fairly invoked").

We require parties to assert the legal principle upon which their claims are based

and to develop the facts in the trial court primarily for two reasons: (1) to alert the trial court to a claim of error so that it has an opportunity to correct any mistake, and (2) to give the opposing party a fair opportunity to respond and show why the court should rule against the objector.

*Gomez*, 1997–NMSC–006, ¶ 29, 122 N.M. 777, 932 P.2d 1.

[I]t is the responsibility of counsel at trial to elicit a definitive ruling on an objection from the court. It is also trial counsel's duty to state the objections so that the trial court may rule intelligently on them and so that an appellate court does not have to guess at what was and what was not an issue at trial.

*State v. Lucero*, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993).

{29} Because Defendant failed to properly preserve this issue and instead is introducing a new argument on appeal, we review this claim for fundamental error. *Cf. State v. Chamberlain*, 112 N.M. 723, 730, 819 P.2d 673, 680 (1991) ("Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error."). We first determine whether the trial court erred in admitting Lausell's testimony under the arguments Defendant made at trial.

**2. Defendant's Preserved Trial Argument**

■ {30} We conclude that the trial court did not err by admitting Lausell's testimony. As noted above, Defendant made a general hearsay objection to Lausell's testimony, and the trial court elicited from defense counsel that he was arguing that Lausell's testimony was inadmissible and that Beckley was lying. The prosecutor countered the hearsay objection with a reference to Rule 11–801, with which the trial court agreed. Because defense counsel did not argue that Beckley's alleged lie referred to a motive to prevent Lausell from leaving her and because his theory of the case was that Lausell himself was an accomplice, the trial court could reasonably presume that if Beckley had a motive to lie which could result in exclusion of the testimony under Rule 11–801, the motive would be consistent with defense counsel's assertions at the time of trial.

{31} At issue before the trial court was Beckley's alleged motive to lie in order to avoid the death penalty and the alleged motive to lie to protect Lausell. These motives occurred *after* she made the statements to Lausell. In the context of the defense counsel's strategy, the trial court properly concluded that Beckley's alleged motive to lie did not predate her statements to Lausell. During opening arguments, defense counsel stated,

Another one made a deal for her life. And part of that deal is that she's to testify here today....

Oh, they use fancy words like, "She's supposed to tell the truth." Well, no, folks. What she's supposed to tell you is the same story she told them the first time around, *truth be damned.*

. . . .

... [S]he is supposed to tell the same story she told the first time she talked to the police ... *to save part of her liberty; another one to save his liberty;* others for the glory of being involved in the case.

(Emphasis added.) Defense counsel was thus arguing that Beckley lied to the authorities when she spoke with them and would lie during her testimony in order to avoid the death penalty. Defense counsel was implying that she was lying to the police in order to protect Lausell because Lausell was the murderer. Defense counsel stated,

The evidence is going to show that she's in love with John Lausell.... And at the time that she gave these statements to the police, didn't know that John Lausell was fixing to do her in....

That's very important to know, because she tries to direct all the attention away from John Lausell. She tries to act as if John Lausell had nothing to do with this. She tries to keep him as far out of this as much as she can.

{32} Defendant's theories in the trial court regarding Beckley's motives to lie were her desire to protect Lausell and her desire to avoid the death penalty. Thus, under *Tome* and *Casaus*, the trial court did not err in

admitting Lausell's testimony regarding Beckley's statements because Beckley's alleged motive to lie arose at the time she spoke to the police, after she made the statements to Lausell.

### 3. Fundamental Error Analysis

█ {33} "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). Initially, we determine whether the trial court erred under Defendant's unpreserved appellate argument.

 {34} The trial court's admission of Lausell's testimony is consistent with this Court's discussion in *Brown*, 1998–NMSC–037, ¶ 43, 126 N.M. 338, 969 P.2d 313:

> At common law, prior consistent statements were admissible for rehabilitation on several theories: (1) to place a supposed inconsistent statement in context to refute the alleged inconsistency; (2) to support the denial of making an inconsistent statement; (3) to refute the suggestion that the witness's memory is flawed due to the passage of time; and (4) to refute an allegation of recent fabrication, improper influence, or motive.

Under this Court's analysis in *Brown*, this case involves the first two theories: Beckley's prior consistent statements to Lausell were admissible for rehabilitation to place a supposed inconsistent statement in context to refute the alleged inconsistency and to support the denial of making an inconsistent statement. Prior consistent statements, to place an inconsistent statement in context to refute the inconsistency and to support the denial of making an inconsistent statement, are admissible for purposes of rehabilitation, because the "rehabilitative use of the statements does not purport to offer the words for the truth of the matter asserted but, instead, to refute a specific attack against the witness's credibility." *Brown*, 1998–NMSC–037,

¶ 45, 126 N.M. 338, 969 P.2d 313. This Court, in *Brown*, concluded that the first three common law theories of admissibility for rehabilitation are not dependent on motive and are therefore not subject to the premotive requirement of Rule 11–801(D)(1)(b). *Id.* ¶¶ 38–46. Rule 11–801(D)(1)(b) "deals only with the fourth theory on which prior consistent statements may be offered." *Brown*, 1998–NMSC–037, ¶ 43, 126 N.M. 338, 969 P.2d 313. Thus, similar to our holding in *Brown*, 1998–NMSC–037, ¶ 46, 126 N.M. 338, 969 P.2d 313, we believe the trial court's decision to admit Lausell's testimony was proper independent of Rule 11–801(D)(1)(b). As a result, the trial court's ruling was proper irrespective of the motive to lie asserted by Defendant for the first time on appeal.

{35} The State asserts that Defendant, while cross-examining Beckley, suggested that the State had attempted "to get her to fabricate testimony that she gave certain information to Mr. Lausell ." We agree. Defense counsel questioned Beckley:

> Q. Ms. Beckley, you understand and know now that your lover has, at least according to all of these reports and everything else, information that nobody else seems to have about this case. You know that, don't you?
>
> A. Yes.
>
> Q. And you know that yesterday afternoon in particular, the District Attorney's office was trying to get you to say that you gave that information to him?

Thus, the State argues that, in order to rebut Defendant's suggestion that Beckley's testimony at trial was inconsistent with her statements to Lausell, the trial court properly allowed the State to introduce Lausell's testimony for rehabilitative purposes, to place a supposed inconsistent statement in context in order to refute the alleged inconsistency and in order to bolster her denial of making an inconsistent statement. Although Defendant argues that defense counsel merely asked one question regarding Beckley's account of events differing from Lausell's version,[2] de-

---

**2.** Defendant argues that this is a "tenuous thread [upon which] the State attempts to hang the full

weight of its contention that Esther Beckley's prior consistent statements preceded a 'motive'

fense counsel repeatedly referred to this theory at trial, implying that Lausell's account contained more detail than she provided to him.

{36} During opening statements, defense counsel suggested that Lausell knew information that he could not have obtained from Beckley:

John Lausell knows lots of intimate information, detailed, about what went on at Hollywood Video, and especially up in the mountains, that Esther Beckley never told him. So one of two things happened: Either the police told him about that information, or he was there. And if he was there, the state made a deal with the devil.

Defense counsel continued with several remarks regarding the theory of what Lausell knew independently, and he questioned Beckley extensively regarding what she told Lausell. Throughout the trial, defense counsel's strategy was to implicate Lausell in the robbery and murders and to imply that Lausell framed Defendant by stating during closing that "only Lausell knew how they were shot" and that "they bought [Lausell's] frame-up."

{37} Following a careful review of the trial transcripts, including the closing arguments, we conclude that the prosecutors used Lausell's testimony as rehabilitation to show that Beckley's statements at trial were not inconsistent with her statements to Lausell. In other words, the State used Lausell's testimony to support Beckley's denial of making an inconsistent statement rather than for the truth of the matter asserted, that Defendant committed the murders and robbery. During closing argument, the State contended,

The eyewitness to the homicides, Esther Beckley, in prison for the rest of her life. She says Shane Harrison did it. She said that Shane Harrison did it when she talked to John Lausell. She said Shane Harrison did it when she talked to the police. She said Shane Harrison did it when she talked to Mr. Mitch LeMay. She said it here.

*She's been completely consistent every single day.* She described everything.

(Emphasis added.). The prosecutor's argument supports the State's theory that the prosecutors were using Lausell's testimony to rebut defense counsel's claim that Beckley's testimony at trial was inconsistent and to bolster her denial of making inconsistent statements at trial.

{38} During closing arguments, the prosecutors' discussion of Lausell was not for the substantive use of Beckley's statements regarding the Defendant; instead, the discussion of Lausell was an attempt to counter defense counsel's claims that Lausell was actually the murderer. The prosecutor stated that Lausell was a "tipster" that pointed the police in the right direction and that he was telling the truth, stating that "[h]e told you the truth. And John Lausell had an alibi." The prosecutor also noted that Lausell had taken a polygraph test, emphasizing that he claimed he was not involved in the robberies and murders. The prosecutor argued that "John Lausell was the fall guy. He was a good fall guy because she loved him, and he became a great fall guy when he got a hundred grand [as a reward for providing information to the police]. So 'John Lausell did it.' " The prosecutors were attempting to counter Defendant's trial strategy that Lausell actually committed the crimes and that Beckley lied to the police in order to protect Lausell and avoid the death penalty. Because the trial court properly admitted Lausell's testimony under Defendant's appellate theory and thus did not err, Defendant clearly did not suffer fundamental error. *Cf. State v. Coffin*, 1999–NMSC–038, ¶ 29, 128 N.M. 192, 991 P.2d 477 (concluding that the trial court's actions "did not constitute error and, therefore, did not rise to the level of fundamental error warranting reversal of Coffin's conviction.").

{39} We conclude, with respect to Defendant's preserved error, that the trial court did not err in admitting Lausell's testimony because Beckley's alleged motives to lie, pro-

that arose the previous afternoon during the State's direct examination." This appears to misapprehend *Brown*, as motive is not relevant under the analysis of the other three forms of

rehabilitation articulated in that case. As discussed above, the State is properly relying on two of the three forms unrelated to motive.

tection of Lausell and avoidance of the death penalty, did not predate her statements to Lausell. We conclude that Defendant raises the argument that the trial court erred in admitting Lausell's testimony because Beckley had a motive to lie predating her statements to Lausell for the first time on appeal. Defendant failed to alert the trial court to this theory, and thus, failed to properly preserve this issue for appeal. Reviewing Defendant's unpreserved appellate argument for fundamental error, we hold that the trial court's admission of Lausell's testimony was also proper under *Brown* as a prior consistent statement for purposes of rehabilitation to place an inconsistent statement in context and to support the denial of making an inconsistent statement. The trial court did not err; therefore, the rule of fundamental error does not apply.

### B. Polygraph Testimony

{40} "In New Mexico, the trial court has discretion to admit results of polygraph tests into evidence if certain conditions, designed to ensure the accuracy and reliability of the test results, are met." *State v. Sanders*, 117 N.M. 452, 459, 872 P.2d 870, 877 (1994). This Court reviews a trial court's admission of polygraph evidence for an abuse of discretion, and the trial court's ruling "will be disturbed on appeal only when the facts and circumstances of the case do not support the logic and effect of the ruling in question." *See State v. Aragon*, 116 N.M. 291, 293, 861 P.2d 972, 974 (Ct.App.1993).

[T]he opinion of a polygraph examiner may in the discretion of the trial judge be admitted as evidence as to the truthfulness of any person called as a witness if the examination was performed by a person who is qualified as an expert polygraph examiner pursuant to the provisions of this rule and if:

(1) the polygraph examination was conducted in accordance with the provisions of this rule;

(2) the polygraph examination was quantitatively scored in a manner that is generally accepted as reliable by polygraph experts;

(3) prior to conducting the polygraph examination the polygraph examiner was informed as to the examinee's background, health, education and other relevant information;

(4) at least two (2) relevant questions were asked during the examination; and

(5) at least three (3) charts were taken of the examinee.

Rule 11–707(C) NMRA 2000.

{41} Defendant argues that the trial court abused its discretion in admitting the testimony of Jim Wilson, who gave Lausell a polygraph examination, because Wilson gave Lausell the exam without complying with Rule 11–707, and because Lausell had medical conditions which Defendant claims interfere with accurate testing. As he did in the trial court, Defendant, on appeal, relies on *State v. Anthony*, 100 N.M. 735, 737–39, 676 P.2d 262, 264–66 (Ct.App.1983). In *Anthony*, the Court of Appeals concluded that it was an abuse of the trial court's discretion to admit the polygraph results at issue because, "[a]s conceded by the State, the examiner was not qualified to determine the possible effect of defendant's admitted physical problem [eye irritation causing pain] on the test results," and because of "the ambiguous nature of the relevant questions." *Id.* at 739, 676 P.2d at 266.

{42} Defendant contends that because Wilson was not a physician, pharmacologist, or psychologist, he was not qualified to evaluate the significance of Lausell's medical conditions on the results of the exam. However, neither our rule nor *Anthony* suggests that a polygrapher must be a physician, pharmacologist, or psychologist. Rule 11–707(B) sets out the minimum qualifications for polygraph examiners, requiring at least five years of experience in the administration or interpretation of polygraph examinations or equivalent academic training and at least twenty hours of continuing education during the twelve months prior to the date of the examination. The Court of Appeals noted the importance of assuring that the examiner is "qualified to determine whether the examinee is a fit subject for testing," but did not intimate that Rule 11–707(B) requires a med-

ical degree or other advanced degree. *Anthony*, 100 N.M. at 739, 676 P.2d at 266.

{43} In the present case, the trial court held a hearing outside of the jury's presence to determine the admissibility of Wilson's testimony. Wilson testified that he attended a basic course in 1969 and maintained continuing education since that time. Wilson testified that he had been qualified as an expert in the area of polygraphy in district court more than 500 times, and had performed over 6,000 exams. He testified at length about research regarding the effects of drugs and medical conditions on polygraphy exams since 1983. We conclude that the trial court did not abuse its discretion by finding that Wilson met the qualifications of Rule 11–707(B).

{44} Defendant argues that Rule 11–707(C)(3) requires the examiner to be informed as to the examinee's background, health, education, and other relevant information, and that if the examiner asks those questions but contends that the answers do not effect the test results, the requirements of the rule are meaningless. Defendant asserts that Lausell's medical conditions were more serious than the painful eye irritation at issue in *Anthony*.

{45} The State observes that Wilson testified about the effects of Lausell's medical conditions and medications on his test. Lausell described his medical conditions to Wilson, including a blood disorder, for which he was taking anticoagulants, indigestion and insomnia, for which he was taking Tagamet, as well as congestion and a slight headache. Wilson testified about control question techniques, which he used with Lausell, and stated that this technique was resistant to medications and other countermeasures, and that an examinee has to have the ability to physiologically respond to either pass or fail a test. He noted that medications which would affect the examinee would have the same effect on relevant, control, and neutral questions. Wilson questioned Lausell about his dosage of a particular medication and performed a reaction test to determine whether he could respond to the testing procedure; Lausell responded with a significant change in diastolic pressure.

{46} Defendant cross-examined Wilson regarding the effects of physical conditions and medications on exams. The trial court found that the State satisfied the requirements of Rule 11–707 and allowed Wilson to testify.

{47} "The factual determination of the admissibility of polygraph evidence lies within the sound discretion of the trial court." *Aragon*, 116 N.M. at 293, 861 P.2d at 974. Wilson informed himself as to Lausell's background, health, and other relevant information, as required by Rule 11–707(C)(3), and he addressed Defendant's assertions regarding the effect of physical conditions and medications on Lausell. Any remaining questions about Lausell's performance on the polygraph exam go towards the weight and not the admissibility of the evidence. *Cf. State v. Anderson*, 118 N.M. 284, 301, 881 P.2d 29, 46 (1994) ("We hold that [under Rule 11–702 NMRA 2000] questions about the accuracy of results [of DNA testing] goes to the weight of the evidence and is properly left to the jury."). We conclude that the trial court did not abuse its discretion by admitting Wilson's testimony.

### C. Defendant's Motion for Mistrial

{48} Defendant argues that the State elicited testimony from Wilson to the effect that if a defendant in a criminal case takes and fails a polygraph test, the defendant does not have to disclose this test result. Defendant asserts that this testimony improperly suggested to the jury that Defendant may have failed a polygraph test. Defendant acknowledges that he cannot find case law on point, and he relies on an analogy to cases addressing a prosecutor's comment on a defendant's silence. Although conceding that the prosecutor's questions in his case were not specifically a comment on a refusal to make a statement to police or to testify at trial, and thus do not directly implicate Defendant's right to remain silent, he contends that the testimony violated his right to a fair trial. Defendant asserts that his decision whether or not to take a polygraph exam and introduce the results is a tactical decision and is protected by attorney-client privilege. Defendant argues that because

Wilson stated that he performs many tests for defense attorneys under conditions of confidentiality, the prosecutor's questions to Wilson improperly suggested that it was likely that Defendant himself was hiding a failed polygraph test.

{49} "The standard generally used for evaluating allegedly improper prosecutorial comments is whether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *State v. Clark*, 108 N.M. 288, 302, 772 P.2d 322, 336 (1989), *overruled on other grounds and sentence vacated by Clark v. Tansy*, 118 N.M. 486, 488–93, 882 P.2d 527, 529–34 (1994), *and overruled on other grounds by State v. Henderson*, 109 N.M. 655, 664, 789 P.2d 603, 612 (1990); *accord United States v. Hernandez–Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999) (concluding that the prosecutor's remarks did not constitute a comment on the defendant's right not to testify). Even if we were to accept an analogy to a comment on a defendant's silence, however, the prosecutor in the present case asked the question regarding defendants in general and did not specify Defendant in particular. Thus, we do not believe that the jury naturally and necessarily took the question as a comment that Defendant failed a test.

{50} The State contends that the context of this questioning is significant and that the questions were not in reference to Defendant but were rebuttal to Defendant's suggestion that Lausell passed the test because he had nothing at stake. The State notes that Defendant, during cross-examination of Wilson, suggested that Lausell was "rather relaxed about the fact that he has an alibi for the weekend of these homicides" and questioned Wilson regarding the effect of lack of fear on a polygraph test. Defendant questioned whether Lausell's agreement with the State and an alibi, prior to taking the polygraph test, would be a "safe kind of thing." In response to these questions by Defendant, the prosecutor, on redirect, asked whether a criminal defendant has to reveal the results if the defendant takes a test, and Wilson stated that a defendant was not under an obligation

to reveal a failed test. The prosecutor asked whether "those people have less to fear, supposedly, than Mr. Lausell," and Wilson responded, "[O]h, absolutely."

{51} Defendant moved for a mistrial, arguing to the trial court that these questions were inappropriate and prejudicial. The prosecutor responded that the questions were intended to contradict Defendant's suggestion "that if you have nothing to lose, you'll pass." The court instructed the prosecutor to "stay clear of the defendant." The prosecutor continued questioning Wilson regarding test subjects' fear and anxiety and whether Lausell was concerned about his results. The State notes that the prosecutor did not mention Defendant and did not state or imply that Defendant had taken a polygraph test during this line of questioning.

{52} The State relies on an analogy to *State v. Rojo*, 1999–NMSC–001, ¶ 57, 126 N.M. 438, 971 P.2d 829. In *Rojo*, this Court discussed a prosecutor's cross-examination of a defense expert on whether criminal investigations regarding background checks included prior felony convictions and whether the prior convictions were admissible in court, and concluded that in context, these questions served the legitimate purpose of eliciting testimony regarding the basis of the expert's claim that police improperly investigated the victim's murder. Under a fundamental error analysis, we held that, "[i]n context, the prosecutor's conduct cannot be construed as an improper effort to introduce evidence of Defendant's prior conviction because the prosecutor did not mention Defendant by name or specify his prior crime." *Rojo*, 1999–NMSC–001, ¶ 57, 126 N.M. 438, 971 P.2d 829.

{53} On appeal, this Court will not disturb the trial court's denial of a mistrial absent an abuse of discretion, "when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Simonson*, 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983). Comparable to our analysis in *Rojo*, in context, we believe that the prosecutor's questions did not improperly imply that Defendant had taken and failed a polygraph exam. *Cf. Chamberlain*, 112 N.M. at 730 n. 4, 819 P.2d at 680 n. 4 (noting that

defendant did not remain silent and concluding that prosecutor's comment did not manifestly intend the remark to be of such a character that the jury would interpret it as a comment on the failure of the accused to testify so as to constitute improper prosecutorial comments). We do not believe that the prosecutor's line of questioning was intended or would be naturally and necessarily interpreted as a comment on Defendant's decision whether to take a polygraph test or on the results of any such test had one been taken. *See Clark*, 108 N.M. at 303, 772 P.2d at 337 ("To decide if the jury would naturally and necessarily assume the statements to be such a comment, the statement must be viewed within its precise context and not in isolation."). Thus, we conclude that the trial court did not err by refusing to grant Defendant's motion for a mistrial.

### D. Defendant's Motion to Reopen

▮ {54} Defendant argues that the trial court abused its discretion by refusing to allow him to reopen his case in order to present polygraph testimony. Defendant rested his case on December 18, 1997, and the State did not present rebuttal. The trial court recessed the case for a holiday break until January 5, 1998. On January 2, Defendant moved to reopen the case to present the testimony of Peter Pierangeli, a polygraph examiner, in order to counter Wilson's testimony regarding Lausell's polygraph examination. Defense counsel stated that he did not send Lausell's charts to an expert for evaluation until after the close of evidence. Pierangeli stated that defense counsel first contacted him on December 24, 1997. Defense counsel stated that he had insufficient funds to pay the witness to testify and that he paid for the witness through personal funds.

{55} Pierangeli stated that he received Lausell's charts and that his initial opinion was that the charts were deceptive. Pierangeli stated that he later received a copy of the pretest interview of Lausell and that he would not have evaluated the charts because the pretest was invalid. He believed that the pretest was invalid due to the pauses on the tape, where the recorder was shut off and then resumed.

▮ {56} This Court reviews a trial court's denial of a motion to reopen the case after the close of evidence for an abuse of discretion. *See State v. Ortega*, 112 N.M. 554, 573, 817 P.2d 1196, 1215 (1991). Two factors which appellate courts consider in this context are the extent to which the movant used due diligence to obtain the testimony and the probable value of that testimony. *See State v. Padilla*, 118 N.M. 189, 198, 879 P.2d 1208, 1217 (Ct.App.1994) (holding that the trial court did not abuse its discretion in denying a motion to reopen the case "[i]n view of Defendants' failure to use due diligence to obtain [a witness's] attendance and the minimal value of the proffered testimony" where defendants did not reveal the witness's name or subpoena him until after the first day of trial, creating scheduling conflicts with the witness).

{57} Defendant's trial counsel was clearly aware that the State was using polygraph expert testimony and did not attempt to secure the rebuttal polygrapher to testify until after the close of evidence in this case. Although Defendant argues that reopening the case for this testimony would have caused little or no prejudice to the State, the prosecutor argued that he would need at least two weeks for adequate preparation, including time to find additional experts. The State notes that approximately two weeks had elapsed while the court was in recess, and if the State needed two weeks to prepare, the jury would have a break of at least one month, which would be burdensome.

{58} Defendant argues that his trial counsel stated that he was to blame but that Defendant should not be punished as a result and, if defense counsel is at fault, then Defendant received ineffective assistance of counsel. Defendant claims that Pierangeli's testimony was essential to his case because his testimony would counter Wilson's, and Wilson's testimony supported the credibility of Lausell, which in turn supported the credibility of Beckley.

{59} The State notes that Pierangeli strongly believed that the polygraph test should not have been given because of the

pretest issues and was very reluctant to offer an opinion regarding the charts because the scoring of the test would be invalid. Thus, the State argues, Pierangeli's opinion that the charts were deceptive was unreliable. The State further argues that Pierangeli's remaining testimony was cumulative to defense counsel's aggressive cross-examination of Wilson.

{60} This Court has rejected a similar argument by a defendant in *State v. Hernandez*, 115 N.M. 6, 13, 846 P.2d 312, 319 (1993), in which the defendant attributed inability of counsel to secure an expert witness in a timely fashion to the public defender's office's lack of funds. In *Hernandez*, we held that the trial court did not abuse its discretion in denying a motion for a continuance, noting that defense counsel adequately placed the state's evidence into question through cross-examination. *Id.* at 15–16, 115 N.M. 6, 846 P.2d at 321–22. Here, defense counsel also assertively cross-examined Wilson. In the present case, because defense counsel did not obtain the witness until after the close of evidence, we conclude, from the prejudice to the State, the delay to the case, and the cumulative nature of the testimony, that the trial court did not abuse its discretion in denying Defendant's motion to reopen the case.

### E. Ineffective Assistance of Counsel

■■■■ {61} Defendant has the burden of demonstrating ineffective assistance of counsel by showing that trial counsel did not exercise the skill of a reasonably competent attorney and that Defendant was prejudiced by trial counsel's performance. *See Duncan v. Kerby*, 115 N.M. 344, 348, 851 P.2d 466, 470 (1993). Defendant has the burden of showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Hernandez*, 115 N.M. at 17, 846 P.2d at 323; *accord Williams v. Taylor*, 529 U.S. 362, ——, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000) (reaffirming this standard from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and stating that "the *Strickland* test provides sufficient guidance for resolving virtu-

ally all ineffective-assistance-of-counsel claims"). "If a defendant does not make such a showing, the defendant has not carried his or her burden, and the presumption of effective assistance controls." *State v. Baca*, 1997–NMSC–059, ¶ 24, 124 N.M. 333, 950 P.2d 776; *accord Hernandez*, 115 N.M. at 16, 846 P.2d at 322 (noting that "counsel is presumed competent").

■■■ {62} Defendant contends that although his trial counsel was clearly aware that the State would present the testimony of a polygrapher and that the comparable credibility of witnesses would be pivotal to his case, his trial counsel did not consult with experts until after the close of evidence. Defendant asserts that his inability to present rebuttal to the State's polygraph evidence was devastating, claiming that the State's case was primarily based on Beckley's and Lausell's testimony and that the credibility of each of these witnesses was supported by Wilson's polygraph testimony.

■■■ {63} "[A] prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel...." *Baca*, 1997–NMSC–059, ¶ 25, 124 N.M. 333, 950 P.2d 776 (citation and internal quotation marks omitted). "The decision whether to call a witness is a matter of trial tactics and strategy within the control of trial counsel." *State v. Orosco*, 113 N.M. 789, 797, 833 P.2d 1155, 1163 (Ct.App.1991), *aff'd*, 113 N.M. at 788, 833 P.2d at 1154; *cf. Baca*, 1997–NMSC–059, ¶ 30, 124 N.M. 333, 950 P.2d 776 (holding that a defendant failed to demonstrate ineffective assistance of counsel when a reasonable attorney may have concluded, as a matter of strategy, not to request a lesser included offense instruction). Defense counsel made a tactical decision before trial not to hire a polygraph expert and to rely on his own cross-examination of Wilson. *See Chamberlain*, 112 N.M. at 734, 819 P.2d at 684 (rejecting ineffective assistance claim, and noting that counsel's decision not to call expert witnesses was a matter of trial strategy); *State v. Vigil*, 110 N.M. 254, 258, 794 P.2d 728, 732 (1990) (rejecting claim that defense counsel's failure to obtain expert testimony was ineffective assistance of counsel). Defense counsel subsequently concluded, af-

ter the close of evidence, that an expert would assist his case and paid for the expert himself. Defendant has failed to demonstrate that defense counsel did not exercise the skill of a reasonably competent attorney.

{64} Further, even if we were to conclude that defense counsel did not exercise the skill of a reasonable attorney, Defendant also failed to meet his burden of showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. Even without Wilson's testimony, the jury heard a great deal of testimony implicating Defendant, including Beckley's testimony, testimony that Defendant purchased the murder weapons and had the guns stored in his apartment after the murders, testimony that his car was at the scene of the McDougall's murders, testimony that Defendant attempted to enter the video store after it had closed the night before the murders, and testimony that Defendant was planning a robbery and that people could be hurt during the robbery. Further, the State notes that defense counsel's strategy was at least partially effective in that it resulted in a hung jury on three murders, six felony counts, and the aggravating circumstances for the death penalty. As the State observes, defense counsel represented Defendant from the outset of the case, he had adequate time to prepare, he filed numerous pre-trial motions, he vigorously cross-examined witnesses, and he is an extremely experienced defense attorney. Thus, we conclude that Defendant's argument is without merit.

### F. Mistrial

{65} Defendant's final issue on appeal is that his right to due process was violated by the trial court's refusal to declare a mistrial after the court learned that three jurors believed that the jury foreperson was attempting to influence them. The trial court's decision to grant a mistrial is discretionary, and this Court will not disturb the trial court's decision absent an abuse of discretion, when the ruling is clearly against the facts and circumstances of the case. *Simonson*, 100 N.M. at 301, 669 P.2d at 1096.

{66} After the second day of deliberations, the bailiff informed the trial court that some of the jurors were complaining that the foreperson was "being very domineering and trying to influence some of the other members." The trial court instructed the bailiff that the jurors could write notes to him if they had problems, and three jurors sent a note complaining that the foreperson was telling them to convict and being argumentative; one juror complained of feeling "railroaded," one complained that the foreperson was not listening and did not want the jurors to take breaks, and one wrote that the foreperson was trying to keep them from having a hung jury.

{67} While the trial court, prosecutor, and defense counsel discussed their options, the jury submitted two more notes. One note stated, "provisional votes, count 28, 27, 26 guilty. Most of the other counts show guilty eight, innocent three. One is abstaining. I know they cannot in the end. The votes are provisional. The person will vote in the end. The three innocent are firm;" the second note requested a transcript of testimony. Defense counsel moved for a mistrial, stating that "if they've reached a unanimous verdict on those three counts, obviously, to accept that and to declare a mistrial as to the remaining counts." Defense counsel argued that the jury should not continue deliberations due to the coercive behavior of the foreperson. The prosecutor opposed the motion, arguing that the notes indicated that the votes were provisional, that it was "clear that the other jurors are operating independently and making their own decisions ..., so there's no indication of coercion," and that the jury had not yet stated that it could not reach a verdict. With the consent of both the prosecutor and defense counsel, the trial court drafted a note which asked the jury, "After discussion with the other jurors, let me know if the three jurors are firm and will not change their opinion." Two jurors responded, "I don't know," and one responded, "Unless you show me more;" the note also stated that the restaurant robbery "is under discussion now." The bailiff told the court that the three jurors said they were not changing their minds regarding the Hollywood Video situation. Defense counsel again

asked the trial court for a mistrial but, after discussion with the prosecutor and trial court, consented to the trial court sending a note to the jury which stated, "Advise the Court when you have considered all the counts and have arrived at unanimous verdicts on some and not able to arrive at unanimous verdicts on the rest." The jury continued to send various notes regarding the counts and exhibits, and the trial court, with the consent of the prosecutor and defense counsel, sent in a supplemental instruction telling the jury that they had the right to elect a new foreperson if they wished.

{68} Defense counsel again moved for a mistrial, stating that he feared that some members of the jury would force the others into voting for a guilty verdict and that press coverage of an unrelated out-of-state criminal case might influence them. The trial court denied the motion, noting that the jurors were aware they could send notes to the court and that the jury was "working very hard."

{69} Defendant concedes that he is unable to provide this Court with any case law on this issue. Defendant argues that the foreperson's conduct contravenes UJI 14–6008 NMRA 2000, which states, "you are not required to give up your individual judgment.... [D]o not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of reaching a verdict." Defendant concludes that because three jurors were "firm" for acquittal at least two days before the verdicts, the foreperson's behavior infringed on Defendant's right to be tried by a fair and impartial jury.

{70} The trial court, after consultation with both the prosecutor and defense counsel, informed the jurors to write notes to the court if they felt pressured and informed them that they could select a new foreperson. *Cf. Chamberlain,* 112 N.M. at 731, 819 P.2d at 681 ("Jurors are encouraged to consult with one another before reaching a conclusion."). As the State notes, the jury did not reach unanimous verdicts on three murder counts, demonstrating that the jurors did not give up their individual judgment. We con-

clude that the trial court did not abuse its discretion in denying Defendant's motion for a mistrial.

### III. Conclusion

{71} We conclude that the trial court did not err by admitting Lausell's testimony or the testimony of the polygraph expert. The trial court did not abuse its discretion by refusing to grant Defendant's motions for a mistrial and his motion to reopen the case. Defendant failed to demonstrate that defense counsel did not exercise the skill of a reasonably competent attorney and failed to meet his burden of showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. Therefore, we affirm Defendant's convictions.

{72} **IT IS SO ORDERED.**

MINZNER, Chief J., BACA,
FRANCHINI and MAES, JJ., concur.