2003-NMCA-108

75 P.3d 862

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**David WILDGRUBE, Defendant–
Appellant.**

No. 21,956.

Court of Appeals of New Mexico.

June 23, 2003.

Certiorari Denied, No. 28,172,
Aug. 15, 2003.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.

David Henderson, Santa Fe, NM, for Appellant.

## OPINION

WECHSLER, Chief Judge.

{1} Defendant David Wildgrube appeals his conviction and sentence for homicide by vehicle in violation of NMSA 1978, § 66–8–101 (1991). Defendant challenges his conviction on the grounds of insufficient evidence to support the conviction, errors in the admission of evidence, prosecutorial misconduct, and errors in sentencing. He also contends that the State is bound by a post-trial agreement between the district attorney and Defendant. We affirm the conviction and sentence.

### Background

{2} Late in the evening of September 10, 1999, after leaving a local bar called Zebediah's, Defendant struck the victim with his car as the victim walked along Highway 434 in Angel Fire, New Mexico. Defendant did not report the collision to the police even though he had in his car a cellular telephone and a ham radio, which could have been used to summon help. The collision killed the victim, whose body was found early the following morning lying in a field on the other side of the guard rail by three men who notified the police. After the police arrived at the scene, they were approached by an individual who told them that the car that struck the victim

could be found at a nearby apartment complex. The Angel Fire Police Department dispatched Lieutenant Walker to the apartment complex. Upon his arrival, Lt. Walker received an additional notice that Defendant had just called 911 to report the incident. Lt. Walker found Defendant in the parking lot, standing by his damaged car, and advised him of his *Miranda* rights. The officer then asked Defendant about the events of the previous evening. After answering several questions, Defendant stated that he wanted to speak with an attorney. Upon completion of the police investigation, a grand jury indicted Defendant, charging him with homicide by vehicle and leaving the scene of an accident involving death or great bodily injury. Following the trial, Defendant was convicted of homicide by vehicle and acquitted of the second charge. The trial court imposed the statutory sentence for a third degree felony of six years and also adjudged the crime to be a serious violent offense. *See* NMSA 1978, § 31–18–15(A)(4) (1999); NMSA 1978, § 33–2–34(L)(4)(n) (1999).

*Sufficiency of the Evidence*

{3} Defendant contends that there was insufficient evidence presented at trial to convict him of vehicular homicide. We review the sufficiency of the evidence under a substantial evidence standard. *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado,* 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). We must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt. *State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994) (relying upon *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We view the evidence in the light most favorable to the verdict, resolving all conflicts and indulging all permissible inferences to uphold the conviction, and disregarding all evidence and inferences to the contrary. *State v. Salazar,* 1997–

NMSC–044, ¶ 44, 123 N.M. 778, 945 P.2d 996. In making this determination, a reviewing court "does not weigh the evidence and may not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319.

{4} In this case, the jury was instructed, based on UJI 14–240 NMRA 2003, that the State was required to prove that Defendant "operated a motor vehicle while under the influence of intoxicating liquor or in a reckless manner" and "thereby caused the death of [the victim]." Defendant challenges only the sufficiency of the evidence regarding impairment and reckless driving; he does not dispute that his car struck and killed the victim.

{5} The jury received an instruction defining "under the influence of intoxicating liquor" as follows:

A person is under the influence of intoxicating liquor when as a result of drinking such liquor the person is less able, to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public.

UJI 14–243 NMRA 2003.

{6} Defendant contends that there was insufficient proof of impairment or intoxication presented at trial. He bases this contention on the testimony of two of the people drinking with him that evening who stated that Defendant did not appear to be intoxicated. Contrary to Defendant's assertion, however, there is ample evidence of impairment or intoxication in the record. During his direct testimony, Defendant admitted that he had consumed a half carafe of wine, approximately sixteen ounces, and two additional alcoholic drinks that evening. *See State v. Omar–Muhammad,* 105 N.M. 788, 792, 737 P.2d 1165, 1169 (1987) (holding that defendant's testimony about marijuana use could support a conviction for vehicular homicide while under the influence of drugs). He also testified that he had not eaten anything at Zebediah's. The jury heard testimony from the Zebediah's bartender who con-

firmed Defendant's admissions and also stated that Defendant's last two drinks were mixed drinks, each of which contained one and one-half ounces of hard liquor. The State presented evidence that Defendant consumed this amount of alcohol in a two-hour period, having arrived at the bar at approximately 9:30 or 10:00 p.m. and having left at approximately 11:30 p.m. Although Defendant testified that his last two drinks, after the half carafe, had been wine rather than mixed drinks and that he had arrived at the bar at 7:30 p.m., the jury was free to reject Defendant's version of events. *See Salazar,* 1997–NMSC–044, ¶ 44, 123 N.M. 778, 945 P.2d 996. In addition, Defendant's testimony that he never saw the victim before hitting him was countered by two witnesses who drove on the same road that evening shortly before Defendant did and testified that they had seen the victim walking on the shoulder of the road. One of the witnesses testified that the shoulder was eight feet wide and that the victim had been walking about four or five feet from the edge of the roadway. Based on this evidence, the jury could have found that Defendant was less able "to exercise the clear judgment and steady hand necessary to handle a vehicle with safety." Reviewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Defendant operated a motor vehicle while under the influence of intoxicating liquor.

■ {7} There was also substantial evidence to support a jury determination that Defendant operated his vehicle in a reckless manner causing the death of the victim. A person has operated a motor vehicle in a reckless manner if he or she "drove with willful disregard of the safety of others and at a speed or in a manner that endangered or was likely to endanger any person." UJI 14–241 NMRA 2003. The evidence that Defendant had been drinking alcohol before driving is relevant to the jury's consideration of Defendant's recklessness. *See State v. Sandoval,* 88 N.M. 267, 268, 539 P.2d 1029, 1030 (Ct.App.1975). Defendant admitted that although it was pitch black outside and difficult to see anything, he continued to drive at 45 miles per hour while he looked

away from the road to find his cell phone. Lt. Walker testified that Defendant told him he was leaning over to get his cell phone from the passenger side of his car when he hit something. The State's accident reconstruction expert testified that, based on the victim's leg injuries, the location of his body, and the location of the debris from Defendant's car, the victim was struck from behind by the right front bumper while he walked on the shoulder of the road. The pathologist from the Office of the Medical Investigator (OMI) who conducted the victim's autopsy testified that the victim had been struck squarely from behind and had suffered "an incredible amount of injury" for this kind of collision. Although Defendant testified that he looked to make sure there were no headlights coming over the hill, the jury could reasonably find that Defendant had operated a motor vehicle in a reckless manner that endangered another person by driving after drinking alcohol, deciding to lean over in the dark to get his cell phone, and driving onto the shoulder of the road. *See State v. Romero,* 69 N.M. 187, 189, 365 P.2d 58, 59 (1961) (concluding that defendant, who testified that the car he struck " '[came] out of nowhere,' " when it had been plainly visible to other witnesses, manifested conduct "so reckless, wanton, and wilful as to show an utter disregard for the rights of others"). The State's evidence was sufficient for the jury to find, beyond a reasonable doubt, that Defendant was guilty of homicide by vehicle. *See State v. Munoz,* 1998–NMSC–041, ¶ 22, 126 N.M. 371, 970 P.2d 143 ("[A] jury's guilty verdict in a vehicular homicide case is its determination that the defendant had the power to prevent the victim's death by driving lawfully instead of recklessly or while intoxicated.").

*Admission of Evidence*

■ {8} Defendant claims that the trial court committed reversible error (1) by refusing to admit evidence of the victim's blood alcohol level during his cross-examination of the pathologist, (2) in admitting the testimony of one of the investigating officers, and (3) by refusing to allow the jury to replay the tape recordings of Defendant's 911 call and his testimony before the grand jury. "An

evidentiary ruling within the discretion of the court will constitute reversible error only upon a showing of an abuse of discretion, and a demonstration that the error was prejudicial rather than harmless." *State v. Jett,* 111 N.M. 309, 312, 805 P.2d 78, 81 (1991) (citation omitted); *accord State v. Allen,* 2000–NMSC–002, ¶ 46, 128 N.M. 482, 994 P.2d 728. Such prejudice must be more than speculative. *See In re Ernesto M.,* 1996–NMCA–039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

### Testimony of the Pathologist

{9} On direct examination, the pathologist testified that the victim's death was caused by multiple blunt force injuries and that the internal injuries had been so severe that there was more than one fatal injury. During cross-examination, Defendant established that the pathologist had requested the OMI toxicology laboratory to perform drug and alcohol screening tests as part of the autopsy.

{10} When Defendant asked the pathologist about the results of the blood alcohol test, the State objected. After the jury was excused, Defendant explained that he wanted to introduce the test results as being "[t]he facts or data in the particular case upon which an expert bases an opinion or inference." Rule 11–703 NMRA 2003. He also relied upon Rule 11–705 NMRA 2003, which provides that on cross-examination, expert witnesses may "be required to disclose the underlying facts or data" upon which they base their opinion. However, when questioned by Defendant during a voir dire examination about the basis of her opinion regarding the cause of death, the pathologist testified that she had arrived at her conclusion and completed the death certificate without waiting for the toxicology report. She stated that although she ordered the toxicology report to be thorough, she did not need it or take it into consideration as a basis for forming her opinion that the victim died of blunt trauma injuries. Accordingly, the trial court ruled that Defendant could not bring in evidence of the victim's blood alcohol level through the pathologist. The court did not rule that the evidence would itself be inadmissible, but only that the pathologist was not the proper witness to introduce the evidence. Defendant did not try to introduce the victim's blood alcohol level through any other witness during the trial. On appeal, he argues that the court's ruling was in error and prejudiced his defense.

{11} Relying upon *State v. Ortiz–Burciaga,* 1999–NMCA–146, ¶ 18, 128 N.M. 382, 993 P.2d 96, Defendant contends that he was prejudiced because "the exclusion compromised his right to present witnesses on his own behalf." In *Ortiz–Burciaga,* this Court found the trial court erred in excluding a witness because her non-cumulative testimony was the key to rebutting the state's expert witness. *Id.* ¶¶ 18–19. However, in this case, the pathologist's testimony was not essential to Defendant's presenting evidence of the victim's intoxication. The court's ruling did not prevent Defendant from presenting evidence or from arguing to the jury about the victim's intoxication. Several witnesses testified that they had seen the victim drinking throughout the evening at Zebediah's and that he had been unsteady on his feet. The trial court did not err in ruling that Defendant failed to establish the proper foundational requirement for the pathologist to testify about the victim's blood alcohol level, and Defendant was not prejudiced by the trial court's ruling. *See State v. Woodward,* 121 N.M. 1, 12, 908 P.2d 231, 242 (1995) (concluding that the refusal to admit cumulative evidence was not an abuse of discretion).

### Testimony of the Investigating Officer

{12} Defendant objects to part of the testimony of Richard Anglin, an Angel Fire police officer, and to the introduction into evidence of a diagram prepared by the officer. On September 11, 1999, Officer Anglin secured and investigated the crime scene where the victim's body was found. The officer testified that he had been a police officer for over twenty years and had conducted a number of highway accident investigations. He testified extensively and without objection about the evidence collected at the crime scene and the methods used by the police to gather the

evidence. He described the system used to measure the location of the debris which resulted from Defendant's car having struck the victim so that the debris distribution could be used to reconstruct the collision. The officer testified that he entered the measurements into a computer which used the measurements to draw a diagram of the scene showing the path of Defendant's car, the point of impact with the victim's body, the point at which the body came to rest, and the location of other physical evidence at the scene. He testified that the diagram accurately represented the measurements he had taken at the crime scene.

{13} When the State moved to enter the diagram as an exhibit, Defendant objected that the diagram was speculative and that it was beyond the capability of the officer to form such a conclusion. The court denied the objection, observing that the officer's training and experience permitted him to give an opinion, as a lay witness, about the meaning of the debris path. The court allowed Defendant to cross-examine the officer on this point. Defendant subsequently conducted an extensive cross-examination of Officer Anglin concerning the collection of data, the preparation of the diagram, and his expertise in using the computer program.

{14} Defendant claims that the admission of the testimony and the exhibit were in error because the officer was not an expert witness and therefore not competent to give this testimony under Rule 11–702 NMRA 2003. Officer Anglin was not offered by the State as an expert witness or designated as an expert by the court under Rule 11–702; rather, the challenged evidence was admitted under Rule 11–701 NMRA 2003. Rule 11–701 governs the admissibility of opinion testimony by lay witnesses and permits their testimony in the form of opinions or inferences when those opinions or inferences are "(A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Diagrams and exhibits are admissible to illustrate testimony as long as they are not misleading. *See Cantrell v. Dendahl,* 83 N.M. 583, 586–87, 494 P.2d 1400, 1403–04

(Ct.App.1972). Their admission is within the discretion of the trial court. *See id.*

{15} The officer's testimony conformed to the conditions established in Rule 11–701; it was based on his perceptions and was helpful to a clear understanding of the testimony about the location of the debris. *See Jones v. State,* 761 So.2d 907, 912 (Miss. Ct.App.2000) (holding that police officer did not have to be qualified as an expert witness to offer an opinion on the point of impact); *accord State v. LaBrutto,* 114 N.J. 187, 553 A.2d 335, 341 (1989) (listing cases). Defendant's challenge goes to the weight and not the admissibility of the evidence. *See State v. Harrison,* 2000–NMSC–022, ¶ 47, 129 N.M. 328, 7 P.3d 478. The trial court did not abuse its discretion in admitting the officer's testimony and the exhibit on this point.

*The Grand Jury and 911 Tapes*

{16} Defendant argues that the trial court committed reversible error by not permitting the jury to replay tape recordings of Defendant's grand jury testimony and 911 call. During deliberations, the jury requested a tape recorder. The trial court initially denied the request, telling the jurors to rely upon their memories of the testimony. Defendant objected to the court's response.

{17} While the jury was still deliberating, the trial court reconsidered its position and decided, relying upon Rule 5–610(A) NMRA 2003 and *State v. Fried,* 92 N.M. 202, 203–04, 585 P.2d 647, 648–49 (Ct.App.1978), to let the jury hear the tape recordings a second time. The court then conferred with counsel about the manner of replaying the tapes; a tape recorder could not simply be provided to the jury because only a portion of the grand jury proceeding had been introduced at trial. *See Fried,* 92 N.M. at 203, 585 P.2d at 648. The court sent a note to the jury informing them that they could listen to the tapes in the courtroom. *See* Rule 5–610(A) (stating that at the discretion of the court, jurors may be returned to the courtroom to hear testimony). The offer was declined because the jury had arrived at a verdict.

{18} Defendant claims that the denial of access to the tapes improperly undercut

the defense and bolstered the prosecution and that he was thereby prejudiced. He claims that the tapes were crucial to rebut the State's theory that he had intentionally avoided the police the night of the accident and that the verdict was distorted by the trial court's initial refusal to replay the tapes. We are not persuaded by these assertions. First, the jury was offered an opportunity to listen to the tapes once more before it returned its verdict. Second, as Defendant acknowledges, he was acquitted of leaving the scene of an accident involving death or great bodily injury. A reviewing court does not speculate about how the jury arrived at its verdict. *State v. Lacey*, 2002–NMCA–032, ¶ 22, 131 N.M. 684, 41 P.3d 952, *cert. denied*, No. 27,358, 131 N.M. 737, 42 P.3d 842 (2002).

*Prosecutorial Misconduct*

{19} Defendant argues that the prosecutor twice improperly commented on his having invoked his right to counsel after receiving *Miranda* warnings. He claims that the first comment occurred during the direct examination of Lt. Walker and the second during the cross-examination of Defendant's trial testimony. He asserts that the prosecutor's comments constituted misconduct, requiring reversal of his conviction.

{20} When an issue of prosecutorial misconduct has been preserved by a specific and timely objection at trial, we review the claim of error by determining whether the trial court's ruling on the claim was an abuse of discretion. *Allen*, 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (recognizing that "the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors") (internal quotation marks and citation omitted). When a claim has not been properly preserved by a specific and timely objection at trial, we have the discretion to review the claim on appeal for fundamental error. *Id.; State v. Peters*, 1997–NMCA–084, ¶ 39, 123 N.M. 667, 944 P.2d 896 (observing that "failure to object to argument bars review on appeal unless the alleged error rises to the level of fundamental error"). "Our resolution of this issue rests on whether the prose-

cutor's improprieties had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *State v. Trujillo*, 2002–NMSC–005, ¶ 49, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted).

*Lt. Walker's Testimony*

{21} Defendant argues that during the testimony of Lt. Walker the prosecutor improperly elicited a comment about Defendant's having invoked his *Miranda* right to silence. On direct examination, the prosecutor asked about the officer's initial meeting with Defendant in the apartment complex parking lot. In describing the sequence of the interview, Lt. Walker testified that, after advising Defendant of his *Miranda* rights, he asked Defendant what had happened the evening before. Defendant responded that he had been at Zebediah's and that he had arrived at the bar around 9:30 p.m. and left between 11:30 and midnight. The officer testified that Defendant told him that on his way home he had leaned over to the passenger side of his car to get a cell phone when he hit what he thought was a deer. Defendant stated that he stopped and looked around from inside the car and, seeing nothing, drove home.

{22} The comment Defendant contends to have been improperly elicited occurred during the following exchange between the prosecutor and Lt. Walker:

[Prosecutor:] Did you ask whether he had had anything to drink at Zebediah's?

[Lt. Walker:] I asked if he had had anything to drink. And he said he had some wine. I then asked him how much he had to drink. And at that time, he stated he didn't want to state anything further until he had consulted with an attorney.

[Prosecutor:] And he told you he went home or left Zeb's about what time?

{23} Because no objection was made by Defendant at trial, we review for fundamental error. In assessing whether a comment has been improperly elicited by the state, our courts have distinguished between inadvertent remarks made by a witness and those

that are intentionally solicited by a prosecutor. *See, e.g., State v. Gonzales,* 2000–NMSC–028, ¶ 39, 129 N.M. 556, 11 P.3d 131; *State v. Baca,* 89 N.M. 204, 205, 549 P.2d 282, 283 (1976). As our Supreme Court has observed, "[i]t is not true ... 'that *any* comment on the defendant's silence must result in a mistrial, or a reversal of the defendant's conviction.'" *State v. Molina,* 101 N.M. 146, 147, 679 P.2d 814, 815 (1984) (quoting *Baca,* 89 N.M. at 205, 549 P.2d at 283).

{24} In this case, the exchange between the prosecutor and Lt. Walker occurred during a narrative of events and was therefore similar to the circumstances in *Baca,* in which our Supreme Court determined that the detective's comment had been "unsolicited, and possibly inadvertent." *Baca,* 89 N.M. at 205, 549 P.2d at 283. The prosecutor did not pursue the officer's comment or otherwise exploit the reference. She continued with the sequence of the officer's interview with Defendant and did not refer to the comment during closing argument. *See Allen,* 2000–NMSC–002, ¶¶ 29–30, 128 N.M. 482, 994 P.2d 728 (noting that the prosecutor did not argue to the jury that they should infer guilt from the fact that the defendant stopped talking during his statement to the police). There was no misconduct on the part of the prosecutor during Lt. Walker's testimony.

### Cross-examination of Defendant

{25} Defendant also asserts that the prosecutor questioned Defendant during cross-examination about invoking his right to silence. In her cross-examination of Defendant, the prosecutor devoted most of her questions to Defendant's claim that he did not know that he struck the victim, but rather believed he had hit a deer when he left the scene. This line of questioning related to the charge of leaving the scene of an accident involving death or great bodily injury. The prosecutor also pointed out the inconsistencies between Defendant's earlier statements to Lt. Walker and to the grand jury and his trial testimony, which had been more self-exculpatory. Defendant, accompanied by defense counsel, had read a prepared statement to the grand jury about the circumstances leading to his invocation of counsel. The State had played the recording of Defendant's grand jury testimony at the close of its case without objection. The prosecutor cross-examined Defendant about the differences between his previous accounts about damage to his car and reaching for the cell phone and his testimony at trial.

{26} In the questioning at issue, the prosecutor challenged Defendant's testimony during direct examination that he had been too upset by the news of the victim's death to talk with the officer. Defendant had testified as follows about his decision to stop answering Lt. Walker's questions and to consult with an attorney:

[Defense attorney:] Let's get back to that conversation with Officer Walker. Do you remember him asking you any questions?

[Defendant:] Yes.

[Defense attorney:] What questions?

[Defendant:] I don't know if he asked where I was or what I was doing, or whatever. But, I—I said that I—or if I had seen him. I said yes, I had—I think I had asked him if he knew who it was. I think that's how that went. And he said he was wearing a big black cowboy hat, and I said, "Oh, my God, I know the guy," or I know who it is, or something of that nature.

And—and in the course of that, that's what I did, I said I saw him at Zebediah's the night before. He asked me what I was doing, and did I have anything to drink. And I said I had some wine. And I don't know what stretch of time this was, exactly. But it was during this time that shortly after that, I—I realized I—I couldn't concentrate very well because I was so shook up about it. And I said I better wait to talk to an attorney, because there's something obviously pretty major here.

[Defense attorney:] What did Officer Walker say to that?

[Defendant:] He said he understood.

In her cross-examination, the prosecutor pointed out that Lt. Walker had simply confirmed what Defendant had already reported to 911—that he had struck someone with his

car the previous night. She also reminded Defendant that he had continued to answer the officer's questions, in contrast to his trial testimony.

{27} On appeal, Defendant challenges the following exchange:

[Prosecutor:] Mr. Wildgrube, it was not until Mr.—or Officer Walker asked you about how much you had had to drink at Zebediah's that you decided that you better not answer his questions; is that correct?

[Defense Attorney:] I'm gonna object to that, your Honor.

THE COURT: Overruled.

Relying upon *Doyle v. Ohio,* 426 U.S. 610, 620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), Defendant contends that this exchange was an improper comment upon his post-*Miranda* silence, depriving him of a fair trial. The issue in *Doyle* was whether a prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story to the police after receiving *Miranda* warnings at the time of his arrest. *Doyle,* 426 U.S. at 611, 96 S.Ct. 2240. The Supreme Court held that it would be unfair to first inform a defendant of his right to remain silent and then argue at trial that a negative inference be drawn from that silence. *Id.* at 618–19. *Doyle* does not apply to this case, however, because Defendant did not remain silent after receiving *Miranda* warnings but chose instead to speak with the officer about the events leading up to the victim's death.

{28} The facts of this case are more similar to those of *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam), in which the Supreme Court held that the *Doyle* prohibition on the use of a defendant's post-arrest silence to impeach does not apply when a defendant voluntarily speaks after being given *Miranda* warnings. In *Anderson,* the defendant argued that the prosecutor's questions on cross-examination, regarding the defendant's failure to tell the same story at the time of his arrest as he was telling at trial, violated the rule announced in *Doyle. Anderson,* 447

U.S. at 407, 100 S.Ct. 2180. The Supreme Court disagreed, stating:

*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

*Id.* at 408. The Court determined this kind of questioning to be proper because it was designed to elicit an explanation for a prior inconsistent statement rather than to draw inferences from silence. *Id.* at 409. In conclusion, the Supreme Court stated: "Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." *Id.; accord State v. Loera,* 1996–NMSC–074, ¶¶ 7–9, 122 N.M. 641, 930 P.2d 176 (holding that, when defendant had not remained silent during questioning, prosecutor's questions were directed to earlier statements and were not an improper comment on defendant's invocation of his rights); *State v. Hennessy,* 114 N.M. 283, 288, 837 P.2d 1366, 1371 (Ct. App.1992) ("[T]he constitutional bar against the use of silence does not apply to cross-examination which inquires into prior inconsistent statements."), *overruled on other grounds by State v. Lucero,* 116 N.M. 450, 453–54, 863 P.2d 1071, 1074–75 (1993).

{29} The State also argues that Defendant cannot give an explanation to the jury for his invocation of counsel and then claim error occurred when he was cross-examined about his testimony. As the Supreme Court held in *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (internal quotation marks and citation omitted):

If [the defendant in a criminal case] takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness.... [H]e has no right to set forth to the jury all the facts which tend in his

favor without laying himself open to a cross-examination upon those facts.

See also *State v. Olguin*, 88 N.M. 511, 513, 542 P.2d 1201, 1203 (Ct.App.1975); *accord State v. Foster*, 1998–NMCA–163, ¶ 13, 126 N.M. 177, 967 P.2d 852. We agree with the State that "as a general proposition, a prosecutor is entitled to respond to defense counsel's argument." *State v. Clark*, 108 N.M. 288, 298, 772 P.2d 322, 332 (1989), *overruled on other grounds by State v. Henderson*, 109 N.M. 655, 789 P.2d 603 (1990), *overruled on other grounds by Clark v. Tansy*, 118 N.M. 486, 882 P.2d 527 (1994); *accord State v. Estrada*, 2001–NMCA–034, ¶ 34, 130 N.M. 358, 24 P.3d 793. However, in this case, the prosecutor's questions, in attempting to impeach Defendant's testimony about when and why he had stopped answering the police officer's questions, did comment improperly on Defendant's invocation of his right to silence. Her final questions on cross-examination are focused more on Defendant's refusal to answer questions than on his inconsistent statements.

{30} We must determine, therefore, whether the trial court abused its discretion in overruling Defendant's objection. We do not disturb such a ruling "unless its ruling is arbitrary, capricious, or beyond reason." *State v. Duffy*, 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807. To do so, we examine the comment within the context of the trial. *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *accord Trujillo*, 2002–NMSC–005, ¶ 60, 131 N.M. 709, 42 P.3d 814 (reviewing prosecutor's statements in the context of the facts and circumstances of the case).

{31} Although we will address Defendant's claim as being preserved below, we note initially that when Defendant objected, he did not state the nature of his objection or move to strike the question to prevent a response. On appeal, Defendant asserts that the objection was to prosecutorial misconduct related to the improper nature of the prosecutor's question on cross-examination. However, there is nothing in the record to indicate that Defendant specifically alerted the trial court to his current claim that the question was an improper comment on De-

fendant's post-*Miranda* invocation of his right to counsel. After the trial court overruled the objection, Defendant did not again object when the prosecutor concluded the cross-examination with two similar questions, nor did he ask for a limiting instruction.

> "[I]t is the responsibility of counsel at trial to elicit a definitive ruling on an objection from the court. It is also trial counsel's duty to state the objections so that the trial court may rule intelligently on them and so that an appellate court does not have to guess at what was and what was not an issue at trial."

*Harrison*, 2000–NMSC–022, ¶ 28, 129 N.M. 328, 7 P.3d 478 (quoting *State v. Lucero*, 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993)).

{32} At the point in the trial when Defendant objected, Defendant's invocation of his right to counsel had already been presented to the jury without objection by Lt. Walker's testimony, by a tape recording of Defendant's grand jury testimony, by the testimony of Defendant's brother (a defense witness), and by Defendant's direct examination. The trial court could well have concluded that Defendant had opened the door or that the prosecutor's questions were cumulative. It may have appeared to the court that Defendant had made a tactical decision not to object to the questions.

{33} When viewed in context, the prosecutor's statements did not prejudice Defendant. *See State v. Johnson*, 102 N.M. 110, 115, 692 P.2d 35, 40 (Ct.App. 1984) (recognizing that "[t]he state may question the plausibility of an exculpatory statement" and concluding that "[t]he jury, having listened to many minutes of argument addressed to the statement, would have understood the [challenged] remark in that context"), *overruled in part on other grounds by Manlove v. Sullivan*, 108 N.M. 471, 775 P.2d 237 (1989). Aside from the evidence presented by the State, which we have concluded to be substantial evidence, the jury heard Defendant in his direct testimony admit that he had struck the victim with his car after having consumed a significant quantity of alcohol and while he was looking for his cell phone rather than

watching the road. There had been other references to Defendant's invocation of his right to counsel without objection. "An isolated, minor impropriety ordinarily is not sufficient to warrant reversal because a fair trial is not necessarily a perfect one." *Allen*, 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted); *accord Greer v. Miller*, 483 U.S. 756, 764, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (holding that a single question by the prosecutor regarding the defendant's post-*Miranda* silence did not violate the Fifth Amendment). Additionally, Defendant was acquitted of the charge which he denied, that he knowingly fled the scene of an accident in which a person had died, indicating that the prosecutor's remarks did not undermine the jury's ability to view the evidence fairly. *See Lacey*, 2002–NMCA–032, ¶ 21, 131 N.M. 684, 41 P.3d 952 (observing that defendant's acquittal "of three of the five counts against him shows that [the jury] was able to carefully apply the facts to the law"). Accordingly, the prosecutor's questions do not constitute reversible error, and the trial court did not abuse its discretion when it overruled Defendant's objection.

*Sentencing*

{34} Defendant claims that the trial court erred when it determined that the offense of vehicular homicide was a serious violent offense under Section 33–2–34, the Earned Meritorious Deductions Act (EMDA). At the sentencing hearing, the trial court heard testimony from friends and relatives of the victim. Defendant also presented testimony from friends and relatives as well as that of a clinical psychologist who opined that Defendant was not alcohol dependent. After the testimony of witnesses, the prosecutor referred to an agreement between the district attorney and Defendant and made no argument as to sentencing. Instead, he stated that he had nothing to add to the testimony at the sentencing hearing, the evidence presented at trial, and the information contained in the presentence report, but would leave the sentence to the discretion of the court. Defendant argued that a sentence of probation and community service

with the Boy Scouts would be sufficient punishment. The trial court imposed a six-year sentence for the vehicular homicide, as a third degree felony resulting in the death of a human being under Section 31–18–15(A)(4). *See State v. Guerro*, 1999–NMCA–026, ¶ 11, 126 N.M. 699, 974 P.2d 669 (holding that Section 31–18–15(A)(4) encompasses vehicular homicide). The court then determined that the crime was a serious violent offense under the EMDA. "A trial court's sentencing is reviewed for abuse of discretion." *State v. Bonilla*, 2000–NMSC–037, ¶ 6, 130 N.M. 1, 15 P.3d 491.

{35} Defendant argues that the trial court's determination that vehicular homicide was a serious violent offense was not supported by the evidence presented at trial or at the sentencing hearing. Defendant raises this issue as a question of fundamental error because he did not object to the trial court's determination during the sentencing hearing. Rule 12–216(B) NMRA 2003. The principle of fundamental error is applied to prevent a miscarriage of justice. *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991).

{36} Under the EMDA, prisoners convicted of serious violent offenses may earn four days of credit for participation in various programs, while prisoners convicted of nonviolent offenses may earn up to thirty days per month. Section 33–2–34(A)(1), (2). The EMDA provides that vehicular homicide is a serious violent offense if the court so determines, based upon "the nature of the offense and the resulting harm." Section 33–2–34(L)(4)(n). In making this determination, the court "must find either an intent to do serious harm or knowledge that one's acts are reasonably likely to result in serious harm." *State v. Morales*, 2002–NMCA–016, ¶ 1, 131 N.M. 530, 39 P.3d 747, *cert. denied*, No. 27,304, 131 N.M. 738, 42 P.3d 843 (2002). The statutory factor of resulting harm must also be a consideration in determining whether the offense qualifies as a serious violent offense. *Id.* ¶ 13.

{37} The trial court's findings in this case conform with the standard articulated in the statute. The court stated that, in making the determination that the vehicular homi-

cide in this case was a serious violent offense, it had considered the evidence presented at trial, including Defendant's testimony, the testimony at the sentencing hearing, and the presentence report. The court first expressed doubt about the psychologist's opinion that Defendant was not alcohol dependent. The court then stated that in addition to the other evidence, it considered the information, contained in the presentence report, that the vehicular homicide was the fourth time that Defendant had been arrested for an alcohol-related driving offense and that he had two previous convictions for DWI. This time, the court observed, Defendant's practice of continuing to drink and drive caused the victim's death. On these facts, the trial court could reasonably conclude that the vehicular homicide was a serious violent offense.

{38} The record further supports the trial court's determination that the vehicular homicide was committed with "knowledge that one's acts are reasonably likely to result in serious harm." *Morales*, 2002–NMCA– 016, ¶ 1, 131 N.M. 530, 39 P.3d 747. Defendant's record of alcohol-related offenses was substantial. On the night in question, he had consumed a significant amount of alcohol in a short amount of time and compounded that problem by driving in a reckless manner such that, while looking away from the road, he drove into and killed a person walking on the shoulder of the roadway. *See id.* ¶ 13 (observing that death "can be viewed as the greatest harm imaginable"). The court's findings were sufficient to support the determination that the vehicular homicide was a serious violent offense. The trial court did not abuse its discretion.

{39} Defendant also asserts that his procedural due process rights were violated because he had no notice that the trial court intended to make a finding under the EMDA. As we understand his argument, Defendant is equating the serious violent offense determination under the EMDA to the aggravation of a sentence under NMSA 1978, § 31–18–15.1 (1993), because, he contends, the finding of a serious violent offense increases the penalty for his crime.

{40} A similar claim was raised in *Morales*, but this Court did not agree, concluding that the EMDA did not add time to the defendant's sentence, because the "[d]efendant's sentence before application of the EMDA was 12 years, and it was still 12 years after application of the EMDA." *Morales*, 2002–NMCA–016, ¶ 6, 131 N.M. 530, 39 P.3d 747. In that case, we stated that the EMDA provision set forth in Section 33–2–34(A)(1) did not alter the prescribed penalty imposed for the offense of vehicular homicide, but rather affected the way "good time" was calculated. *See Morales*, 2002–NMCA–016, ¶ 8, 131 N.M. 530, 39 P.3d 747 (recognizing that " 'the finding ... simply had an impact upon the amount of time by which defendant through his own "good conduct" could *decrease* his sentence' ") (quoting *People v. Garry*, 323 Ill.App.3d 292, 257 Ill.Dec. 64, 752 N.E.2d 1244, 1250 (2001)). Similarly, in this case, Section 31–18–15(A)(4) authorized the trial court to sentence Defendant to six years for a third degree felony resulting in death, which it did. Defendant's sentence before the trial court's finding of a serious violent offense was six years, and it was still six years after the court's determination that the vehicular homicide was a serious violent offense.

{41} Defendant relies upon *Caristo v. Sullivan*, 112 N.M. 623, 818 P.2d 401 (1991), which involved an aggravation or enhancement of a sentence, to support his notice claim. However, in *Caristo*, our Supreme Court recognized that a defendant has already been put on notice of aggravation if the aggravating circumstance "was an element of the offense or a fact upon which such an element was established." *Id.* at 631, 818 P.2d at 409. The Court also stated that ordinarily a presentence report would provide adequate notice of any circumstances that were not established at trial. *Id.* at 632 n. 7, 818 P.2d at 410 n. 7. Even under the standard required for notice for aggravation of sentence, Defendant had notice of the factors that could be considered by the court in arriving at a sentence for vehicular homicide. *See State v. Badoni*, 2003–NMCA–009, ¶ 21, 133 N.M. 257, 62 P.3d 348, *cert. denied*, No. 27,840, 133 N.M. 126, 61 P.3d 835 (2003) (concluding that the defendant received suffi-

cient notice of a firearm enhancement to comport with New Mexico's traditional notice requirements). The sentencing hearing did not deprive Defendant of notice or a meaningful opportunity to be heard. Defendant does not assert that he lacked notice of the nature of the hearing or contend that the hearing did not provide him with an opportunity to be heard in a meaningful manner. Defendant has not shown how he was prejudiced by the alleged lack of notice or explained how he would have prepared differently for the hearing. *See State v. Vallejos,* 2000–NMCA–075, ¶ 35, 129 N.M. 424, 9 P.3d 668.

{42} Finally, we note that at the time Defendant was sentenced in December 2000, the EMDA had been in effect since July 1, 1999. Enactment of the statute would have put Defendant on notice. *See State v. Tower,* 2002–NMCA–109, ¶ 9, 133 N.M. 32, 59 P.3d 1264, *cert. denied,* No. 27,744, 133 N.M. 30, 59 P.3d 1262 (2002) ("Every person is presumed to know the law."); *People v. Brady,* 34 Cal.App.4th 65, 40 Cal.Rptr.2d 207, 212–13 (Ct.App.1995) (holding that the challenged sentencing statute was "in full force and effect" which would have given the defendant notice that his ability to earn good conduct credits in prison would be limited under the statute); *People v. Wickland,* 268 Ill.App.3d 758, 206 Ill.Dec. 31, 644 N.E.2d 799, 802 (Ill.App.Ct.1994) ("[T]he public is generally held to have notice of a bill's contents at the time the bill is passed in its final form."); *accord People v. Stork,* 305 Ill.App.3d 714, 238 Ill.Dec. 941, 713 N.E.2d 187, 191 (1999); *State v. Chapman,* 685 A.2d 423, 425 (Me.1996); *State v. Wyrick,* 62 S.W.3d 751, 793–94 (Tenn.Crim. App.2001); *State v. Sell,* 110 Wash.App. 741, 43 P.3d 1246, 1250 (2002). The statute under which Defendant was sentenced specifically refers to the EMDA. *See* § 31–18–15(F) ("When the court imposes a sentence of imprisonment for a felony offense, the court shall indicate whether or not the offense is a serious violent offense, as defined in Section 33–2–34 NMSA 1978.").

{43} To the extent that Defendant's claim may be seen as a challenge to the constitutionality of the statute, *Morales* addressed the issue and concluded that, because the EMDA involved sentencing factors, it complied with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Morales,* 2002–NMCA–016, ¶ 1, 131 N.M. 530, 39 P.3d 747; *cf. State v. Wilson,* 2001–NMCA–032, ¶ 29, 130 N.M. 319, 24 P.3d 351, *cert. quashed,* No. 26,923, 132 N.M. 484, 51 P.3d 527 (2001).

*Agreement with District Attorney*

{44} As we understand Defendant's brief in chief, he contends that the State is bound by an agreement made after the trial by the district attorney of the Eighth Judicial District and Defendant. Defendant and the district attorney reached an agreement as to sentencing. They also agreed that if the trial court did not accept the recommendation, the district attorney would stipulate to a mistrial and agree to a new trial for Defendant. Apparently, as part of any motion for a new trial, the agreement stated that the district attorney would "confess error." The nature of that error is not part of the record.

{45} The State responds that the district attorney did honor the agreement at the sentencing hearing, noting that the trial court was not bound by an understanding as to sentencing between Defendant and the district attorney. *Cf. State v. Mares,* 119 N.M. 48, 51, 888 P.2d 930, 933 (1994) (recognizing that a trial court has broad discretion to accept or reject a plea agreement). With regard to the rest of the agreement, there is nothing in the record to indicate that Defendant ever filed motions for a mistrial or for a new trial.

{46} In response to Defendant's claim that the agreement is still somehow binding to confess error, the State points out that on appeal the attorney general, not the district attorney, represents the State. *See* NMSA 1978, § 8–5–2(A) (1975) (stating that the attorney general shall "prosecute and defend all causes in the supreme court and court of appeals in which the state is a party or interested"). Further, as the State points out, even were the State to "confess error," this Court is not bound by a concession of error on appeal made by the attorney general. *See State v. Martinez,* 1999–NMSC–018

¶ 26, 127 N.M. 207, 979 P.2d 718 ("[A]ppellate courts in New Mexico are not bound by the Attorney General's concession of an issue in a criminal appeal."). As Defendant himself acknowledges, this Court is not bound by any agreement below.

*Conclusion*

{47} We affirm Defendant's conviction and sentence for vehicular homicide.

{48} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and IRA ROBINSON, Judges.