IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2024-NMCA-068

Filing Date: August 13, 2024

No. A-1-CA-40717

STATE OF NEW MEXICO,

     Plaintiff-Appellee,

v.

HUGH SMITH,

     Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Karen L. Townsend, District Court Judge

Raúl Torrez, Attorney General
Santa Fe, NM
Aletheia V.P. Allen, Solicitor General
Peter James O'Connor, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

OPINION

WRAY, Judge.

{1}    Determining the credibility of witnesses at trial is a core function of the jury. *See State v. Alberico*, 1993-NMSC-047, ¶ 88, 116 N.M. 156, 861 P.2d 192. Nevertheless, in the present case, a forensic interviewer and an investigating officer (collectively, the Witnesses) testified about the credibility of the two victims (Victims) and Defendant. Thereafter, the jury returned a guilty verdict on seven counts of third degree criminal sexual contact of a minor (child under thirteen) (CSCM), contrary to NMSA 1978,

Section 30-9-13(C)(1) (2003), two counts of bribery or intimidation of a witness, contrary to NMSA 1978, Section 30-24-3 (1997), and one count of false imprisonment, contrary to NMSA 1978, Section 30-4-3 (1963). In relevant part, Defendant requests that this Court reverse the convictions because the Witnesses improperly vouched for the credibility of Victims and disparaged Defendant's credibility. We conclude that the Witnesses improperly testified as experts regarding Victims' and Defendant's credibility, and in the context of the entire trial and despite Defendant's failure to object, the admission of this testimony was plain error. We therefore reverse Defendant's convictions. Having confirmed that sufficient evidence supported the convictions, we remand for a new trial without reaching Defendant's remaining appellate issues.

## BACKGROUND

{2}     Based on the reports of his two stepsisters, Defendant was charged with twenty counts related to allegations of CSCM, bribery of a witness, and false imprisonment. At trial, Victims' testimony was followed by the testimony of a forensic interviewer (the Interviewer) and the investigating detective (the Detective).

{3}     The Interviewer described her experience conducting forensic interviews and her observations during the interviews with Victims. The Interviewer explained that for forensic interviews, the goal is not to get the subject to make a disclosure, but it is to "listen and to understand the experience that they've gone through." On cross-examination, when asked whether she believed Victims made full or false disclosures, the Interviewer stated that (1) as to one of the Victims, she believed that there was a partial disclosure and that based on her experience with false disclosures, did not believe that this victim's disclosure was false; and (2) as to the second victim, the Interviewer thought there had been a full disclosure, and she "believed her."

{4}     After the Interviewer, the State called the Detective, who testified about his training and experience working in the violent crimes division, as well as observations he made while watching the forensic interviews with Victims and during his interview with Defendant. The Detective described his training and experience discerning truthfulness, as follows:

> So, there, there's training—there's training for that. But this is one of those things where, you know, we always talk about in law enforcement training and experience. You really, you really can't have one without the other. They, they need to—to—to mesh together. So you can have all the training in the world and if you have no experience, you—you—really don't know what—what to expect or, or how to do it properly. So I would say, you know, at the point that you have the training which I have and, and then the experience—the first time I saw a kid lying, I knew what that looked like. And I mean, lying off a script, right? A kid that had been coached. And through all the training I had been through, I really didn't grasp that. I didn't understand that. But with the first time you experience it, you're like, okay, now I—I know what that looks like. I get it.

The Detective then testified that he saw no signs of "coaching" and "didn't see any signs that [Victims] weren't telling the truth." When testifying about his interview with Defendant, the Detective explained various techniques that he claimed allowed him to discern whether the subject is lying, including asking baseline questions, building a rapport, and then looking for a reaction when the suspect is confronted with the allegations. The Detective offered an example of a "guy that ended up being innocent" who "was furious" when confronted with allegations, and described Defendant's response to being confronted with the allegations in contrast as "kind of just nonchalant." During the interview, the Detective told Defendant that the Detective believed there are two types of people, good people who make mistakes and are sorry and people who do not care about repercussions. In response, Defendant described nonsexual touching with Victims and apologized if he had inadvertently upset Victims. The Detective thought Defendant "was upset, he was tearing up." The Detective interpreted this response as follows: "I felt like he was being truthful about what he was giving me. You know, again, partial truths, but I think he felt bad. I think he felt bad about—about everything." After this testimony by the Detective, the jury heard more than ninety minutes of a redacted recording of the interview.

**{5}**    It was in this context that on cross-examination, Defendant's counsel asked the Detective if he went into the interview with Defendant looking for certain answers, and the Detective replied, "I wanted the truth. So yes, I believe the girls. So I wanted him to talk about what happened . . . I believe it did happen—I didn't want to be lied to." When asked whether he can tell when somebody is lying, the Detective stated, "I believe so, yes." Referring back to the "two types of people" testimony from direct examination, Defendant's counsel asked about a third type of person, those who "didn't do it," and the Detective agreed that he did not identify that group for Defendant, because he "believe[d Defendant] did these acts." Shortly after this testimony, the following exchange took place:

> Defendant's counsel: You, you seem to get frustrated when you were interrogating [Defendant] that—that he wouldn't remember specific details, what you would refer to as—the incident. Could it be that he didn't have those specific details because it didn't happen? Is that a possibility?
>
> The Detective: I didn't think so. No.
>
> Defendant's counsel: But is that a possibility?
>
> The Detective: Sure. Anything's possible. That wasn't my mindset though.
>
> Defendant's counsel: Because you went in there with a specific mindset that, that he was guilty and that you are going to get him to talk?
>
> The Detective: Yes.

Defense counsel asked, "So just to be clear, there was no polygraph, but you're convinced he was lying?" The Detective responded, "I—I believe—correct. There was no polygraph and I do believe what the girls had said. Yes."

{6}     After Defendant testified, the jury returned guilty verdicts, and the district court imposed a sentence of forty-two years. This appeal followed the district court's denial of Defendant's motion to reconsider the length of the sentence.

**DISCUSSION**

{7}     It is undisputed that Defendant's counsel did not object to the testimony about credibility elicited by the State and, therefore, did not preserve this issue for review. Defendant argues that the admission of the testimony of the Interviewer and the Detective as to their beliefs about the credibility of Victims and Defendant was plain error. "To find plain error, we must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." *State v. Garcia*, 2019-NMCA-056, ¶ 10, 450 P.3d 418 (alteration, internal quotation marks, and citation omitted). Plain error applies "in cases raising evidentiary matters in which the asserted error affected substantial rights, though they were not brought to the attention of the trial judge." *Id.* Defendant maintains that this Court must evaluate whether the credibility testimony of the Witnesses impacted "substantial rights to due process and a fair trial" particularly because "credibility was the pivotal issue in this case." As we explain, we agree that the Witnesses' testimony amounted to plain error and conclude that remand for a new trial is an appropriate remedy because the evidence presented at trial supported Defendant's convictions. *See id.* ¶ 17.

**I.      In the Context of the Trial as a Whole, the Witnesses' Testimony Amounted to Plain Error**

{8}     Witness credibility is not the purview of expert witnesses, particularly when the "case boiled down to a 'swearing match' between the defendant and the complainant," and it is therefore "likely that the expert testimony pertaining to the credibility of the complainant and the identity of the perpetrator was instrumental in the jury's decision to convict." *Alberico*, 1993-NMSC-047, ¶ 94. In the present case, there was no physical evidence presented at trial, and Defendant and Victims were the only witnesses to the abuse. As a result, Victims' and Defendant's testimony and their credibility was pivotal. *See State v. Lucero*, 1993-NMSC-064, ¶ 22, 116 N.M. 450, 863 P.2d 1071. Thus, "direct testimony regarding the credibility or truthfulness of the alleged victim of sexual abuse" is "expressly prohibit[ed]." *Alberico*, 1993-NMSC-047, ¶ 85; *see Lucero*, 1993-NMSC-064, ¶¶ 15-17 (concluding that expert testimony that comments "directly upon the credibility of the complainant" or opines that symptoms "were in fact caused by sexual abuse" intrudes "too far upon the jury's function as arbiter of the witnesses' credibility," and it was plain error to admit it when the testimony was pivotal); *Garcia*, 2019-NMCA-056, ¶¶ 12, 16 (determining that it was plain error to admit credibility testimony when it was pivotal and a witness "repeatedly commented, both directly and indirectly, upon [the v]ictim's truthfulness, identified [the d]efendant as [the v]ictim's

molester numerous times based solely on [the v]ictim's statement of events, and repeated in detail [the v]ictim's statements regarding the sexual abuse").

**{9}** The "effect" of the Witnesses' testimony was to indicate to the jurors that they believed Victims were "telling the truth" and that the Detective believed Defendant was dishonest and had abused Victims. *See Alberico*, 1993-NMSC-047, ¶ 87. The credibility testimony in the present case developed on a continuum. *See State v. Montoya*, 2015-NMSC-010, ¶ 46, 345 P.3d 1056 ("[I]n determining whether there has been plain error, we must examine the alleged errors in the context of the testimony as a whole." (alteration, omission, internal quotation marks, and citation omitted)). On direct examination, the Witnesses couched broad opinions that touched on credibility within the context of their experience and training surrounding interviews, and the Detective testified as to his own method for determining whether a witness was telling the truth. On cross-examination, Defendant directly challenged both Witnesses and identified what had otherwise been implied: Witnesses believed or did not believe Victims and Defendant. While Defendant elicited the direct comments on credibility from the Witnesses when the State had been more circumspect in questioning, the result remains—the nature of the testimony on direct examination gave rise to a "legal conclusion that [Victims were] not fabricating [their] story." *See Alberico*, 1993-NMSC-047, ¶ 87. Taken as a whole, the Witnesses' testimony as we have described served no purpose other than impermissible vouching and encouraged the jury to surrender its duty to determine credibility. This, our courts have determined, experts cannot do. *See id.* ¶ 86 ("When the only evidence consists of the victim's accusation and the defendant's denial, expert testimony on the question of who to believe is nothing more than advice to jurors on how to decide the case." (internal quotation marks and citation omitted)).

**{10}** The State has both conceded and challenged the Witnesses' status as experts and relied on both positions at different times on appeal to support the admissibility of the Witnesses' testimony. In its briefing, the State argued that the Witnesses' expert qualifications supported the admission of their opinion testimony. We have already explained that the strictures on credibility testimony apply to expert witnesses, and we therefore consider this argument no further. At oral argument, however, the State changed course and asserted that the Witnesses were not experts because they relied on their specialized knowledge and not scientific knowledge. The State's uncertain view of the record is somewhat understandable because neither witness was offered or qualified as an expert at trial in order for the district court to perform its function to ensure that the Witnesses' opinions satisfied the requirements for expert testimony. *See* Rule 11-702 NMRA; *see also State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228 (explaining that the district court must exercise a "gate[]keeping function and ensure that the expert's testimony is reliable"). Defendant does not challenge on appeal the failure to offer or qualify the Witnesses as experts. Because, however, the Witnesses' expert status is the basis for the State's arguments that the testimony was properly admitted, we continue and consider whether the Witnesses were experts and the impact of their expertise on the admissibility of their testimony to the jury.

**{11}** Expert opinion, unlike lay witness testimony, must be offered by a witness who is qualified by "knowledge, skill, experience, training, or education" to "help the trier of fact to understand the evidence or to determine a fact in issue." *See* Rule 11-702 (Testimony by expert witnesses.); Rule 11-701(A) NMRA (requiring that lay opinion testimony be "rationally based on the witness's perception"). Our courts have explained that "[a] witness may be admitted as an expert under Rule 11-702 upon the satisfaction of three requirements: (1) 'that the expert be qualified'; (2) that the testimony 'will assist the trier of fact'; and (3) that the expert's testimony concern 'scientific, technical or other specialized knowledge.'" *State v. Ruffin*, 2019-NMCA-009, ¶ 18, 458 P.3d 445 (quoting *Alberico*, 1993-NMSC-047, ¶¶ 43-45). These characteristics distinguish expert opinion testimony from lay opinion testimony, which are opinions that are "[(1)] rationally based on the witness's perception, [(2)] helpful to clearly understanding the witness's testimony or determining a fact in issue, and [(3)] not based on scientific, technical, or other specialized knowledge within the scope of Rule 11-702." *See* Rule 11-701.

**{12}** The State posited at oral argument that the Witnesses did not offer expert testimony based on a distinction in New Mexico law between scientific opinions and opinions based on specialized knowledge. This distinction arises from the third requirement for the admission of expert testimony under Rule 11-702—that an expert's opinion must be based on "'scientific, technical or other specialized knowledge.'" *See Torrez*, 2009-NMSC-029, ¶ 19 (quoting Rule 11-702). When an expert's opinion is based on scientific knowledge, the district court uses the multifactor test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-95 (1993) and adopted in *Alberico*, *see* 1993-NMSC-047, ¶ 51, in order to determine whether the expert's opinion is "grounded in valid, objective science" and "reliable enough to prove what it purports to prove," *id.* ¶ 54. In New Mexico, however, the *Daubert/Alberico* test is "inapplicable to expert testimony that is based on the expert's specialized knowledge," as opposed to scientific knowledge. *Torrez*, 2009-NMSC-029, ¶ 21. This is not to say that New Mexico district courts need not determine "whether expert testimony is competent under Rule 11-702" when the expert's opinion is based on specialized knowledge. *Id.* To make that determination, the role of the district court is to "evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *Id.*

**{13}** The use of the *Daubert/Alberico* test or another evaluation to determine the trustworthiness of an expert's opinion has little bearing on whether a witness is or is not an expert. Expert testimony "is neither the kind of personal observation that a lay person is capable of making nor common knowledge within the general public." *State v. Duran*, 2015-NMCA-015, ¶ 15, 343 P.3d 207; *see* Rule 11-701(A) (limiting lay opinion to testimony that is "rationally based on the witness's perception"). Information not known by the general public includes "[k]nowledge contained in treatises and understood by practitioners in their particular field," *Duran*, 2015-NMCA-015, ¶ 16, as well as knowledge that is beyond personal observation and "a product of . . . specialized training and experience not possessed by" the average person, *Ruffin*, 2019-NMCA-009, ¶ 17.

**{14}** Expert witnesses may apply their specialized knowledge to form opinions based on personal observations, as our case law demonstrates. The officer in *Ruffin* described his personal observations of an accident scene but also "explain[ed] his conclusions regarding what those observations mean[t] and opine[d] as to the cause of the accident in light of his specialized training and experience." *Id.* ¶ 17. In *Duran*, a witness's testimony about delayed disclosure in child sex abuse cases "was based not just on her personal observations, but also on specific statistics compiled in [a] . . . specialized work environment." 2015-NMCA-015, ¶ 17. The conclusions in these cases that the witnesses were experts and not lay witnesses flow naturally from a 2006 amendment to Rule 11-701(C), *see* Rule 11-701, annot., which added the requirement that lay opinion testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 11-702." Rule 11-701. Before the amendment, district courts properly admitted lay opinion testimony that may have been based on specialized knowledge but otherwise satisfied the personal knowledge requirements. *See State v. Wildgrube*, 2003-NMCA-108, ¶ 15, 134 N.M. 262, 75 P.3d 862 (determining that the district court did not abuse its discretion in admitting as lay opinion an officer's accident reconstruction testimony that "was based on his perceptions and was helpful to a clear understanding of the testimony about the location of the debris").

**{15}** The Witnesses' testimony in the present case was expert testimony. Each of the Witnesses began their testimony describing their experience and training, the nature of their work, and the goals and procedures for their work. After that, each of the Witnesses described their personal observations of the subject, put those observations in the context of their experience and training, and formed an opinion about whether the behavior of Victims or Defendant was consistent with a tenant of each of the Witnesses' particular training and experience. In this way, the Witnesses applied their specialized knowledge to form an opinion drawn from their personal observations. This is expert testimony. *See Ruffin*, 2019-NMCA-009, ¶ 17; *Duran*, 2015-NMCA-015, ¶ 17.

**{16}** Nevertheless, the State suggested at oral argument that because the testimony was based on specialized knowledge, the principles limiting expert witness credibility testimony that were articulated in *Alberico*, *Lucero*, and *Garcia* do not apply because in those cases, the expert witnesses were "scientific" experts. The holdings in those cases, however, did not rely on the scientific bases for the experts' opinions. To the contrary, despite the admissibility of expert testimony that satisfies Rule 11-702, experts may not "tell the jury that a witness is telling the truth" in all cases because the rule "was not intended to permit experts to tell the jury what result to reach." *Alberico*, 1993-NMSC-047, ¶ 84; *see Lucero*, 1993-NMSC-064, ¶ 18 ("Determining the complainant's credibility or truthfulness is not a function for an expert in a trial setting, but rather is an issue reserved for the jury."); *Garcia*, 2019-NMCA-056, ¶ 16 (highlighting that the importance of credibility in the trial gave rise to "grave doubts concerning the fairness of the trial"). The present case similarly involved a central credibility question and a jury that received testimony from experienced and trained professionals that went directly to the credibility of Victims and Defendant. We therefore conclude, in the context of all of the testimony, that the Witnesses' testimony amounted to plain error.

## II.  The Sufficiency of the Evidence

**{17}**  The remedy for plain error is dismissal or retrial, depending "on the legal sufficiency of the [s]tate's evidence in support of [the d]efendant's convictions at the first trial." *Garcia*, 2019-NMCA-056, ¶ 17. To evaluate whether sufficient evidence supports Defendant's convictions, we consider "all the evidence admitted by the [district] court," including the "wrongfully admitted evidence," and if it is sufficient, "then retrial following appeal is not barred." *Id.* ¶ 18 (internal quotation marks and citations omitted). Applying well-established standards of review, *see id.*, and measuring the evidence against the jury instructions, *see State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883, we conclude that sufficient evidence supported all of Defendant's convictions.

**{18}**  In the present case, the jury was instructed on the crimes of CSCM for Counts 1 through 7, intimidation of a witness for Counts 8 and 9, and false imprisonment for Count 12. Counts 1 through 5, 8, 9, and 12 relate only to one victim (Victim One). Counts 6 and 7 relate only to the other victim (Victim Two). We review the evidence supporting the CSCM counts for both Victims, followed by the intimidation and false imprisonment counts for Victim One.

**{19}**  The evidence supported the CSCM counts. As to Counts 1 through 5, Victim One testified that Defendant touched her breasts and vagina on six occasions during spring, summer, and winter break, and that she was under thirteen years old at the time of each incident. As to Counts 6 and 7, Victim Two testified that on multiple occasions, Defendant put her feet on his penis, that she was eight years old at the time, and that visits with Defendant happened during spring and winter break. This testimony is sufficient to establish the elements of CSCM. *See* UJI 14-925 NMRA ("Criminal sexual contact of a minor . . . ; essential elements."); *State v. Lente*, 2019-NMSC-020, ¶ 64, 453 P.3d 416 ("Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential." (internal quotation marks and citation omitted)).

**{20}**  The intimidation and false imprisonment counts were also supported by the evidence. Victim One established the elements of Counts 8 and 9, intimidation of a witness, by testifying that after two separate incidents of CSCM, Defendant told her not to tell anyone because no one would believe her and he would hurt her. *See* UJI 14-2403 NMRA ("Intimidation of a witness to prevent reporting."). Count 12, false imprisonment, was established by Victim One's testimony that during the incident occurring over spring break, Defendant locked the door and covered her mouth. *See* UJI 14-401 NMRA ("False imprisonment; essential elements.").

**{21}**  Because sufficient evidence supported each of Defendant's convictions, retrial is permissible on remand. *See State v. Cabezuela*, 2011-NMSC-041, ¶ 40, 150 N.M. 654, 265 P.3d 705 (explaining that when "sufficient evidence was presented at trial to support a conviction, then retrial is not barred" (internal quotation marks and citation omitted)).

**CONCLUSION**

**{22}** We reverse Defendant's convictions and remand for a new trial.

**{23}** **IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JANE B. YOHALEM, Judge**